**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 97-60046**

---

**UNITED STATES OF AMERICA,**

**Plaintiff - Appellee,**

**VERSUS**

**PAUL MARTIN McCARTY,**

**Defendant - Appellant.**

---

Appeal from the United States District Court
for the Southern District of Mississippi

(3:96-CV-429-LN)

---

March 22, 1999

Before HIGGINBOTHAM, DUHÉ, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:[*]

Paul Martin McCarty, federal prisoner # 03463-043, appeals the district court's denial of his 28 U.S.C. § 2255 motion. We affirm.

**I.**

McCarty was charged and convicted by jury on two counts of bank robbery, in violation of 18 U.S.C. § 2113(a), and one count

---

[*]  Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of using a firearm during a bank robbery, in violation of 18 U.S.C. § 924(c).  McCarty was sentenced to two 175-month concurrent terms on each of the bank robbery counts, and a 60-month consecutive term on the firearm offense, for a total of 235 months.  McCarty appealed, and this Court affirmed McCarty's conviction and sentence in October 1994.  *United States v. McCarty*, 36 F.3d 1349 (5th Cir. 1994).

In June 1996, McCarty filed this 28 U.S.C. § 2255 motion seeking relief from his conviction and sentence.  The district court denied relief and denied McCarty's motion for reconsideration.  This Court granted a limited certificate of appealability.  On appeal, McCarty alleges: (1) that the government suppressed impeachment evidence relating to government witness Alan Lucero's criminal history, in violation of his Fifth Amendment Due Process right and the principles articulated in *Brady v. Maryland*, 83 S. Ct. 1194 (1963); (2) that the government knowingly used perjured testimony from Lucero, in violation of his Fifth Amendment Due Process right and the principles articulated in *Napue v. Illinois*, 79 S. Ct. 1173 (1959); and (3) that the district court impermissibly impaired his constitutional right to cross-examine and impeach Lucero by publishing an erroneous calculation of the benefit Lucero received in exchange for his testimony against McCarty to the jury, in violation of his Sixth Amendment Confrontation right and the principles articulated in *Davis v. Alaska*, 94 S. Ct. 1105 (1974).  We affirm the district court's decision denying relief.

## II.

The government presented thirty-three witnesses and fifty exhibits tying McCarty to the crimes with which he was charged at trial. The quantum of evidence tying McCarty to his crimes is material to our decision that McCarty has not alleged any error affecting his substantial rights, and is therefore not entitled to relief on his § 2255 motion.

Two days before Christmas in 1992, a man costumed in a black wig, a baseball cap, a fake beard and moustache, coveralls, white tennis shoes, and gloves entered the Sunburst Bank on Lakeland Drive in Jackson, Mississippi carrying a black zipper bag. The man handed the teller a demand note and then gestured for the teller to empty both of her cash drawers. The robber gestured to waive the teller away from the security bait bills and dye pack. A subsequent audit of the teller's drawer revealed that the robber made off with $13,816.

Five days later, a silver Ford Thunderbird that had been reported missing by Hertz Rent-A-Car's Jackson International Airport location was recovered from the parking lot of an office building off of Lakeland Drive in Jackson. From the trunk of the Thunderbird the police recovered a black wig, a baseball cap, a fake beard and mustache, coveralls, and white tennis shoes, as well as a .38 caliber revolver and a white clasp 8" X 10" envelope containing .38 caliber practice rounds. The Thunderbird showed no signs of forced entry. Law enforcement officers therefore

3

suspected that the car might have been stolen by someone who had access to a key. Hertz rental records established that Paul McCarty, the defendant in this action, had rented the silver Thunderbird on November 23, and returned the car on November 30. McCarty was the only recent local renter of the vehicle.

On December 29, 1992, six days after the robbery, McCarty purchased a brand new blue 1993 Chevrolet pick-up truck. McCarty made a sizeable cash down payment of $7,295.01 and received a $1,500 trade-in allowance against the $18,272.01 purchase. Testimony at trial established the McCarty was employed at an annual salary of approximately $20,000.

On January 21, 1993, McCarty rented a maroon Lincoln from the Avis Rent-A-Car location in Meridian, Mississippi. McCarty checked the car out at 12:15 p.m. and returned it 30 minutes later, at 12:45 p.m. McCarty drove a total of five miles in the car. Sometime prior to January 31, 1993, the maroon Lincoln rented by McCarty disappeared from the Avis lot.

On February 11, 1993, Jan Mickelberg and her sister were in their home on Autumn Oaks Drive in Jackson. Autumn Oaks is located in a residential area near the Magnolia Federal Bank. About 9:00 p.m. something triggered motion detectors in Mickelberg's driveway and her outside lights came on. Mickelberg looked out her window and observed a blue pickup truck that she did not recognize in her driveway. As Mickelberg watched, the truck pulled out of the driveway with its lights off and parked on Mickelberg's street. A man, later identified at trial as McCarty, walked to a ditch at the

4

dead end of Mickelberg's street.  The man stayed near the ditch for a few minutes before walking to the opposite end of the street and leaving the neighborhood on foot.  About fifteen minutes later, while Mickelberg and her sister were sitting on her porch, the man returned, started the truck, drove to the end of the street without turning on his lights, and left.

The next day, a man wearing a black wig, a baseball cap, a fake beard and moustache, coveralls, and tennis shoes, and carrying a satchel, robbed the Magnolia Federal Bank near Mickelberg's house.  The robber approached teller Jeannette Chase and told her he needed a money order.  The robber simultaneously handed Chase a typewritten note stating "this is a robbery."  Chase got up to get the money order from another teller's window, but then froze when she read the typewritten note.  The robber saw Chase freeze and went to the second teller's window, then pulled a gun from his coveralls and pointed it at Chase, screaming at her to cooperate.  The robber collected $15,475 from three tellers, pointing the gun at each and ordering them to empty their cash drawers before fleeing the bank on foot.

Bank customer Bruce Dent was sitting in his car outside the bank as the robber fled.  Dent testified that the robber fled on foot, dropping his baseball cap in the street.  The robber then mounted a bicycle.  When Dent closed in on the bicycle, the robber abandoned the bicycle and began rummaging in the satchel he was carrying, spilling more than $8,000 on the ground in the process.  Eventually, the robber pulled out a gun and Dent retreated behind

some cars.  Dent heard two shots fired.  At the same time, Dent observed a Jeep rapidly reversing from the area where the robber was last seen and the shots were fired.  Law enforcement officials investigating the robbery later recovered the robber's demand note, his grey baseball cap, and the spilled cash.

In the meantime, McCarty's fingerprints were found to be on the white clasp 8" X 10" envelope recovered with the disguise used in the Sunburst robbery from the stolen Thunderbird that he had previously rented.  A warrant was issued for McCarty's arrest, and for a search of his apartment and his blue pick-up truck.  Among the items seized were two sets of keys found in McCarty's truck.

### III.

McCarty was arrested and detained at the Madison County Detention Center.  During this time, McCarty shared a communal cell with Alan Lucero.  McCarty shared certain information about his crimes with Lucero.  Lucero relayed that information to law enforcement.

Lucero told the authorities that McCarty admitted to both the Sunburst and Magnolia bank robberies.  Lucero told authorities that McCarty said he had rented a silver Thunderbird and a maroon Lincoln and duplicated the keys for both cars.  Lucero told authorities that the silver Thunderbird had been rented at the Jackson airport, while the maroon Thunderbird had been rented in Meridian.  McCarty told Lucero that he had worn a disguise including a wig in both robberies, and that he had used a nylon

stocking cap to prevent his own hair samples from being left in the wigs. Lucero described the Sunburst robbery, and said that after the robbery McCarty had driven the Thunderbird to an office building where McCarty's work truck was parked. McCarty told Lucero that at the parking lot he transferred the disguise and other items used in the robbery to the trunk of the Thunderbird and then left the car in the parking lot, leaving in his work truck.

Lucero also described the Magnolia robbery. Lucero said that McCarty told him he had "jacked a shell in the chamber" of a .45 caliber weapon when the teller froze. Lucero described how McCarty had to dump money on the ground after the robbery to gain access to the weapon. Lucero told law enforcement that McCarty had described firing shots at a Jeep that was pursuing him. McCarty told Lucero that he used the maroon Lincoln to escape, and then parked the car at a restaurant while he drove his own truck home to clean up. Lucero said McCarty told him that McCarty later returned to the restaurant and transferred the disguise, weapons, and other items used in the Magnolia robbery to the trunk of the Lincoln. McCarty then drove the Lincoln to an apartment complex adjacent to his own and parked the Lincoln in the adjacent lot in a location that could be observed from McCarty's own apartment. Lucero said that McCarty told him he had moved the car often in the days before his arrest to avoid suspicion. McCarty also said that the car was still parked in the adjacent lot and had not been disturbed when McCarty was arrested at his apartment.

McCarty told Lucero that the keys to the Lincoln had been

seized when his truck was searched, but that McCarty's lawyer could get the keys back. Lucero thought he might be released on bond to care for his ailing mother. When Lucero conveyed this information to McCarty, McCarty proposed a plan by which Lucero would get the keys to the Lincoln, and use the disguise in the trunk to pull another robbery. That way, McCarty reasoned, police would be lured into believing that the robber was still on the loose. Lucero told law enforcement that McCarty said there was a padlock on the floor of the Lincoln. The key to the padlock was supposed to be on one of the key rings seized from McCarty's truck. McCarty told Lucero to be sure and remove the padlock from the Lincoln.

Lucero also told law enforcement that McCarty said McCarty used a .45 caliber semi-automatic firearm, a .38 caliber revolver, and a .22 caliber revolver in the robberies. McCarty told Lucero that the .45 and the .22 were in the trunk of the Lincoln. McCarty told Lucero that he had secured these weapons in residential burglaries of a one-story and a two-story house in a specified neighborhood. McCarty said he had tried to use credit cards stolen in these robberies and that certain merchants had refused him. McCarty told Lucero that he intended to harm these merchants and other potential witnesses against him if he could arrange it. Lucero said his concern for the welfare of these potential witnesses and his belief that McCarty was serious about carrying out these threats caused him to come forward with the information.

Using Lucero's information, police quickly located the maroon Lincoln previously rented by McCarty and subsequently reported stolen. Law enforcement had no knowledge of the Lincoln or its role in the Magnolia robbery before Lucero came forward with information about McCarty's crimes. The Lincoln was found parked at an apartment complex adjacent to McCarty's. The Lincoln was visible from McCarty's apartment. Keys fitting the Lincoln were found on one of the key rings seized from McCarty's truck. On the floor of the car, police recovered a padlock. A key fitting the padlock was discovered on one of the key rings seized from McCarty's truck. From the trunk of the car, police recovered the typewriter used to type the demand note recovered from the Magnolia robbery, the wig and fake beard and moustache worn during the Magnolia robbery, the coveralls worn during the Magnolia robbery, a .45 caliber semi-automatic firearm with a loaded clip, a .22 caliber revolver, and a black shoulder holster. Consistent with Lucero's information, neither of the wigs used in the Sunburst and Magnolia robberies contained hair samples that could be matched to McCarty. Further, the firearms seized from the silver Thunderbird and the maroon Lincoln were later determined to be firearms stolen in two residential burglaries in the area identified by Lucero.

**V.**

Lucero had arrived at the Madison County Detention Center in January 1993, about one month before McCarty, and about three weeks

before the Magnolia robbery.  There is no allegation that McCarty and Lucero were acquainted prior to that time.  Lucero was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) and § 924(a)(2), and one count of possession of the same firearm, a sawed-off shotgun included in the definition given at 26 U.S.C. § 5845(a)(2), in violation of 26 U.S.C. § 5861(d).  Both of the counts alleged against Lucero carry a statutory maximum sentence of ten years.  *See* 18 U.S.C. § 924(a)(4); 26 U.S.C. § 5871.

Lucero provided information and later testified against McCarty at trial in exchange for more favorable treatment in the disposition of his own case.  Lucero testified that he had arranged a plea bargain in which the government would dismiss count 2 in exchange for his guilty plea on count 1 before he approached law enforcement with the information about McCarty.  When Lucero delivered the information about McCarty, the government agreed to ask for a downward departure with respect to count 1, provided Lucero cooperated fully and testified against McCarty at trial. Lucero and the government executed a memorandum of understanding. In that document, the government's agreement to move for dismissal of count 2 was added by hand after the document was prepared, which is consistent with Lucero's testimony that the dismissal of count 2 had already been arranged and was separate from the agreement to offer leniency in exchange for Lucero's testimony against McCarty. The structure of and language used in that agreement is likewise consistent with Lucero's testimony that the dismissal of count 2

10

did not form part of the reward he received for testifying against McCarty. For example, the agreement does not set forth Lucero's understanding with respect to the statutory penalty applicable to count 2, as it does for count 1. Lucero's memorandum of understanding is part of the record in this case, and the agreement was read to the jury in full during McCarty's trial.

Lucero was sentenced months before McCarty's trial began. Lucero pleaded guilty to count 1, and count 2 was dismissed. The government moved for, and the district court granted, a four-level downward departure with respect to count 1. The government's motion for downward departure is part of the record in this case, and the existence of and grounds for that motion were disclosed to the jury at McCarty's trial. Because of ex post facto concerns, Lucero's sentence was determined on the basis of the 1990 version of the sentencing guidelines rather than the guidelines in effect at the time of sentencing. McCarty's counsel attended Lucero's sentencing.

McCarty's appellate arguments relating to the reward Lucero received for his testimony against McCarty are dependant upon certain intricacies involved in the calculation of Lucero's sentence under the sentencing guidelines. It is therefore necessary for us to set forth in some detail the basis upon which Lucero was sentenced.

Lucero's sentence for count 1, charging that Lucero was a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), was determined using U.S.S.G. § 2K2.1. The 1990 version of

§ 2K2.1 provided a base offense level of 12 for § 922(g) violations. The district court reduced that base offense level by two levels for acceptance of responsibility and by four levels pursuant to the government's motion, yielding a base offense level of 6. Lucero had 15 criminal history points, which yielded a criminal history category of VI. Under the 1990 guidelines, an offense level of 6 and a criminal history category of VI yielded a range of 12 to 18 months. The district court presiding over Lucero's case imposed an 18 month sentence. The statement of reasons for sentence entered by Lucero's sentencing court was introduced into evidence and made the subject of testimony at McCarty's trial. The criminal judgment against Lucero was also introduced into evidence at McCarty's trial.

Lucero was not, of course, sentenced on count 2, which the government agreed to dismiss. Notwithstanding evidence that the government agreed to dismiss count 2 before Lucero approached law enforcement about McCarty, and notwithstanding the fact that there was no factual predicate for Lucero's conviction on count 2 or for any within guideline adjustments with respect to count 2, McCarty's counsel was permitted to explore the effect of the dismissal of count 2 on Lucero's sentence, and the jury was permitted to consider the dismissal of count 2 as part of the consideration Lucero received for testifying against McCarty.

## VI.

At McCarty's trial, Lucero testified in a manner consistent

12

with his earlier statements to law enforcement and McCarty was convicted. McCarty's claims in this § 2255 action all relate to Lucero's testimony. Specifically, McCarty maintains that the government suppressed information that Lucero had four, rather than two, prior felony convictions and that the government knowingly used Lucero's perjured trial testimony that he had only two prior felony convictions. McCarty also maintains that the district court and the government published an erroneous calculation of Lucero's reward for testifying against McCarty to the jury which impaired his Sixth Amendment right to cross-examine Lucero.

Neither Lucero's identity as a repeat player in the criminal justice system nor the fact that he received favorable treatment from the government in exchange for his testimony was concealed at trial. Indeed, the prosecution opened Lucero's direct testimony by revealing Lucero as a convicted felon who was testifying in exchange for more favorable treatment. Lucero testified that he was currently serving an 18 month sentence for a federal felon in possession of a firearm offense, but that he would have received a much longer sentence but for his cooperation with law enforcement and subsequent trial testimony against McCarty. Lucero testified in particular that he thought his sentence would have been five or six years longer if he had not cooperated with law enforcement. Lucero testified that he had used quite a few aliases in the past to evade law enforcement and "stay out of jail." With respect to prior convictions, Lucero testified that he had two prior felonies, in addition to the conviction for which he was incarcerated: (1) a

13

1981 Colorado larceny conviction, for which he served two and one half years, and (2) a 1987 Colorado attempted forgery charge, for which he served three years. Lucero further testified that he had an extensive history of drug use, but that he had not used drugs since 1992, when he was incarcerated on a drug use charge.

On cross-examination, McCarty's counsel attempted to impeach Lucero's testimony by underscoring Lucero's criminal history and by emphasizing that Lucero's favorable plea bargain gave him a strong incentive to provide damaging testimony against McCarty. McCarty's counsel began by having Lucero read the government's two-count indictment against Lucero into the record. The indictment, which charged felon in possession of a firearm and possession of the same firearm, includes the two prior state convictions identified by Lucero as the factual predicate of the felon in possession charge. Having established those prior convictions, McCarty's counsel then elicited Lucero's agreement that, because count 1 and count 2 each carried a statutory maximum penalty of ten years imprisonment, Lucero could have been sentenced to a period of twenty years imprisonment, instead of the 18 month period of imprisonment actually imposed. Lucero then testified again that his understanding of the potential sentencing range before he agreed to provide information about McCarty had been between six and eight years. McCarty's counsel clarified that those figures were based upon Lucero receiving good time credit, and therefore serving only eighty-five percent of his time. McCarty's counsel then had Lucero read the entire text of the memorandum of understanding entered

14

into between Lucero and the government into the record. That reading informed the jury again that the potential statutory penalty for Lucero's conviction on count 1 was ten years. Lucero was also quizzed with regard to his basic agreement with the government; that is, that the government would seek a downward departure with respect to count 1 in exchange for Lucero's testimony. Although the memorandum of understanding also recited that the government would seek dismissal of count 2, Lucero testified that the government had previously agreed to dismiss count 2 in exchange for Lucero's guilty plea. McCarty's counsel then used the NCIC "rap sheet" provided by the government to cross-examine Lucero about prior convictions and aliases. McCarty's counsel was able to reinforce the jury's knowledge that Lucero had been incarcerated on a drug charge in 1992 and to elicit that Lucero also had a prior misdemeanor conviction for assault. McCarty's counsel introduced the government's motion for downward departure with respect to count 1, as evidence that Lucero's agreement with the government was consummated. McCarty's counsel also introduced a copy of the district court's statement of reasons for the sentence imposed upon Lucero, and a copy of the criminal judgment against Lucero. McCarty's counsel then attempted to enhance the jury's impression of Lucero's self-interested motivation for testifying by introducing a letter drafted by Lucero to one of his girlfriends, in which Lucero expressed the belief that he could have faced 30 years in prison without the deal offered by the government.

On redirect, the government attempted to mitigate somewhat the substantial demonstration of Lucero's incentive to testify against McCarty. The government explored the sentencing court's statement of reasons for imposing an 18 month sentence on Lucero. Lucero testified that the offense level applicable to his offense was 10 before the government's motion for downward departure, and 6 after the government's motion for downward departure. Lucero testified that he had 15 criminal history points and a criminal history category of VI. The government then asked the district court to take judicial notice of the fact that a base offense level of 10 and a criminal history category of VI carried a guideline range of 24 to 30 months. After ascertaining that there was no objection from the defense, the district court took judicial notice that a base offense level of 10 and a criminal history category of VI would yield a sentence of 24 to 30 months. Shortly thereafter, the district court instructed the jury that it was permitted, but not required, to accept any judicially noticed fact as conclusive.

At the close of Lucero's testimony, McCarty's counsel asked the district court to take judicial notice concerning the application of the sentencing guidelines to count 2 of the indictment against Lucero. During a bench conference, the district court expressed reservation about the need for doing so in light of Lucero's testimony. McCarty's defense counsel nonetheless urged the district court to apply the guidelines before the district court to Lucero's indictment to reach a guideline range. The district court once again expressed reservation, this time about

the accuracy of any such a determination made without the benefit of a probation officer. During further discussion, the district court stated that Lucero's two firearm offenses would probably merge for sentencing purposes, because they involved the same weapon. McCarty's counsel did not object to the district court's supposition that the guidelines would not produce a longer range for both counts, but instead indicated agreement, stating that he "had overlooked the fact it was the same weapon" in both counts. The district court thereafter informed the jury that the dismissal of count 2 would not have any effect on the guideline range, because the same guidelines applied to both counts.

Assuming, as McCarty does on appeal, that the dismissal of count 2 formed part of the consideration given to McCarty for his testimony against McCarty, then this judicial instruction was in error. The parties agree that, under either the 1990 guidelines applicable to Lucero's conviction, or the 1992 guidelines referred to the district court at McCarty's trial, Lucero's conviction on count 2 would have resulted in a higher base offense level, and thus a longer sentence, than the sentence applicable to Lucero's conviction on count 1 alone.

During closing argument, the government argued that Lucero's deal with the government was not so favorable that it would provide Lucero with a strong incentive to provide false testimony. Specifically, the government argued that Lucero received an 18 month sentence when he could have been sentenced to 30 months. McCarty's counsel responded that Lucero believed he might get 30

17

years before he made his deal with the government. McCarty's counsel argued that Lucero's own belief about the potential penalty was more probative of his motivation for testifying than a technical application of the sentencing guidelines. McCarty's counsel also pointed out that the government could still prosecute Lucero on count 2 if it was not pleased with Lucero's testimony. In rebuttal, the government responded that, even if Lucero still faced prosecution on count 2, his sentence would not exceed 30 months.

The district court then instructed the jury. The jury instructions included strong limiting instructions with respect to Lucero's testimony. The district court instructed the jury that it could consider a witness's prior convictions for felonies or crimes involving dishonesty or false statements as a factor when weighing the credibility of the witness. The district court also instructed the jury that the testimony of an informant who receives a reduced sentence in exchange for testimony "must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses."

## VII.

In August 1995, many months after this Court affirmed his conviction on direct appeal, McCarty filed a pro se letter requesting that the district court conduct an in camera inspection of Lucero's federal presentence report to determine whether Lucero had felony convictions in addition to those that were disclosed in

18

Lucero's testimony. The district court initially denied that motion on the basis that McCarty had not filed any § 2255 motion for relief, but agreed to review Lucero's PSR after McCarty filed a motion for reconsideration documenting Lucero's criminal history.

The district court's order reviewing Lucero's PSR recognizes that Lucero did indeed have a third felony conviction, a 1987 Colorado conviction for theft, in addition to the 1981 Colorado larceny conviction and the 1987 Colorado attempted forgery conviction to which Lucero admitted at trial. The district court observed, however, that McCarty could not prevail on a § 2255 motion claiming that Lucero committed perjury. The district court noted that the sentences for Lucero's two 1987 convictions were served concurrently, and that Lucero's objections to his own PSR indicate that Lucero thought the two 1987 felonies were sufficiently related as to form the same offense, at least for sentencing purposes. In June 1996, McCarty filed this § 2255 motion.

## VIII.

McCarty claims that the government suppressed evidence that Lucero had prior felony convictions in addition to the 1981 larceny conviction and the 1987 attempted forgery conviction. *See **Brady v. Maryland***, 83 S. Ct. 1194 (1963). When the government suppresses material evidence that is favorable to the accused after a request to disclose the same, the conviction is secured in violation of the Due Process clause and cannot stand. *Id*. at 1196-97. To establish

19

a due process violation under *Brady*, McCarty must establish: (1) that the prosecution suppressed evidence, (2) that was favorable to the defense, and (3) material to the issue of guilt or punishment. *See*, *e.g.*, *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir. 1999); *United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996); *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991).

McCarty also claims that the government knowingly used Lucero's perjured testimony that he had only two prior felony convictions at trial. *See Napue v. Illinois*, 79 S. Ct. 1173 (1959). A conviction obtained through the use of evidence known to be false by the prosecution likewise violates the Due Process clause and cannot stand. *Id*. at 1177. The *Napue* principle holds true without regard to whether the prosecution affirmatively offers false evidence, or instead merely allows false evidence to go uncorrected. *Id*. To establish a due process violation under *Napue*, McCarty must establish (1) that Lucero's testimony was false, (2) that the state knew it was false and nonetheless permitted the testimony to remain unchallenged, and (3) that the testimony was material. *See Creel_v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998); *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994).

*Brady* and *Napue* apply when the suppressed evidence concerns the credibility of a witness, as well as when the suppressed evidence directly concerns the guilt or punishment of the accused. *See Napue*, 79 S. Ct. at 1177 ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain

20

a tainted conviction . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness."); *United States v. Kopycinski*, 64 F.3d 223, 225 (5th Cir. 1995) ("*Brady* encompasses evidence that may be used to impeach a witness's credibility."). In either event, however, the suppressed evidence must be proven material.

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." *United States v. Agurs*, 96 S. Ct. 2392, 2400 (1976). Evidence is material, for the purpose of alleged due process violations under *Brady* and *Napue*, when there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed to the jury. *Kyles v. Whitley*, 115 S. Ct. 1555, 1565 (1995); *United States v. Bagley*, 105 S. Ct. 3375, 3383 (1985); *Freeman*, 164 F.3d at 248. "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the defendant's trial. *Bagley*, 105 S. Ct. at 3383. The defendant need not demonstrate that he would have been acquitted if the evidence had been disclosed. *Kyles*, 115 S. Ct. at 1565-66. The question is not whether admission of the evidence would have changed the verdict, but whether the defendant received a fair trial in the absence of the suppressed evidence. *Id*. at 1566. Stated differently, the test is whether the excluded evidence can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*.

Our materiality inquiry is applied to the suppressed evidence collectively, and not item by item. *Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir. 1996); *Kopycinski*, 64 F.3d at 226. Thus, it becomes important to identify the body of evidence that McCarty alleges was suppressed or made the subject of false testimony. McCarty identifies *Brady* and *Napue* error arising out of Lucero's mistaken testimony that he had only two prior felony convictions. McCarty alleges that contrary to Lucero's testimony, he actually had at least four prior felony convictions: (1) the 1981 Colorado larceny conviction Lucero admitted to at trial; (2) the 1987 Colorado attempted forgery conviction Lucero admitted to at trial; (3) the 1987 Colorado theft conviction identified in the district court's order reviewing Lucero's PSR; and (4) a 1992 Colorado conviction for use of a controlled substance. McCarty argues that the government either knew or should have known about the additional prior convictions. The government relies upon affidavit testimony from the prosecuting attorney that his knowledge of Lucero's criminal history came from the NCIC rap sheet, which apparently did not include those convictions, and witness interviews with Lucero.

We note in passing that the record does not support the proposition that the government knowingly suppressed Lucero's criminal history or knowingly permitted Lucero to falsely testify concerning his criminal history. In addition, there are considerable problems with characterizing the 1992 Colorado

22

conviction for use of a controlled substance as admissible evidence of a prior felony conviction that Lucero should have disclosed. First, the 1992 conviction is listed on Lucero's PSR as a pending charge, rather than a conviction. That charge is not included in the PSR's calculation of criminal history points or category. That charge formed no part of the sentencing court's calculation of Lucero's guideline range. Moreover, aside from the PSR's fleeting statement that "use of a controlled substance" is a "Class 5 felony," there is no support in this record for the proposition that the offense should have been, but was not, considered a felony for the purpose of determining Lucero's guideline range. There is no evidence that the conviction, if final at all, would have been admissible for the purpose of impeaching Lucero. Finally, Lucero testified at McCarty's trial that he had been incarcerated in 1992 on a drug charge, and never asserted in any way that he was innocent of the charge. Indeed, Lucero admitted he had an extensive history of drug abuse that ended when he was incarcerated on that charge. Thus, the offense was not suppressed, and McCarty's counsel could have cross-examined Lucero on the disposition of that case. Even if the 1992 charge concluded with a final conviction, that fact would have added little to Lucero's testimony that he had been incarcerated on the charge. In sum, we have substantial reservations about relying upon the suppression of the 1992 use of a controlled substance charge as a predicate for error in this case. We will nonetheless assume, for the purposes of this opinion, that Lucero's testimony erroneously failed to

23

disclose both the 1987 Colorado theft conviction and the fact that Lucero's incarceration in 1992 concluded with a felony conviction for use of a controlled substance.

McCarty also argues, much less directly, that the government suppressed information concerning the effect that the dismissal of count 2 against Lucero had on the reward that Lucero received for testifying against McCarty. We have already identified Lucero's uncontroverted testimony that the dismissal of count 2 was negotiated before he offered information against McCarty. Nonetheless, we will assume, for purposes of McCarty's Fifth Amendment claims, that the dismissal of count 2 formed part of Lucero's reward for providing information about and testifying against McCarty. Thus, the evidence allegedly suppressed includes: (1) Lucero's 1987 Colorado theft conviction; (2) Lucero's 1992 Colorado use of a controlled substance conviction; and (3) information relating to the effect of the dismissal of count 2 against Lucero on Lucero's actual sentence. Having identified the precise evidence that McCarty alleges was suppressed, we proceed to an analysis of whether this evidence was material to the jury's judgment of McCarty's guilt.

Materiality "depends almost entirely on the value of the evidence relative to other evidence mustered by the State" at trial. *Spence*, 80 F.3d at 995. "'[W]hen the testimony of a witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence is generally not found to be material.'" *Spence*, 80 F.3d

24

at 995 (quoting *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)); *see also Kopycinski*, 64 F.3d at 226 ("When the withheld evidence seriously undermines or impeaches a key witness's testimony on an essential issue, we look to whether the testimony was strongly corroborated by other evidence."). Moreover, suppressed evidence is much less likely to be material when it is merely cumulative of other impeachment evidence presented at trial. *Spence*, 80 F.3d at 995.

The district court relied on these principles to find that the additional impeachment evidence identified by McCarty was not material because it could not have feasibly affected the outcome of McCarty's trial. We review that determination de novo, *see Freeman*, 164 F.3d 243, and affirm.

## X.

We begin by noting that the physical and testimonial evidence against McCarty was overwhelming. Much of that evidence was derived directly from information Lucero gave law enforcement long before trial. Prior to the time that Lucero came forward, law enforcement was completely unaware that a Lincoln had been used in the Magnolia robbery. Lucero's information led police directly to the vehicle, which was found as Lucero said it would be in the parking lot next to McCarty's apartment, in a place visible from McCarty's apartment. Lucero correctly identified the color of the Lincoln, as well as the fact it had been stolen from the Meridian, Mississippi Avis Rent-A-Car location, where it had been previously

25

rented for 30 minutes by McCarty. Lucero correctly identified the contents of the Lincoln, including the disguise, the padlock, and the make of the weapons discovered there. Lucero's information led authorities to connect the keys taken from McCarty's truck to the stolen Thunderbird and Lincoln used in both the Sunburst and Magnolia robberies. Lucero's information that the weapons found in the Thunderbird and Lincoln were obtained in residential burglaries of a specified area permitted the prosecution to link McCarty with the weapons found in the Lincoln. In sum, Lucero's pretrial information permitted the authorities to develop substantial physical and testimonial evidence tying McCarty to the crimes with which he was charged. By the time of trial, Lucero's testimony was helpful, but far from essential, for conviction.

Lucero's trial testimony was consistent with his earlier statements, and was strongly corroborated at trial with the consistent physical and testimonial evidence. Bank customer Bruce Dent corroborated Lucero's testimony that McCarty had dropped money on the ground and fired shots at a Jeep when fleeing the Magnolia robbery. F.B.I. agent Willie Covington corroborated Lucero's testimony as to the location and contents of the Lincoln. Victims of McCarty's residential burglaries corroborated Lucero's testimony that the guns used in the Sunburst and Magnolia robberies had been stolen from their homes. Indeed, virtually every aspect of Lucero's trial testimony was independently corroborated by another state witness at trial. In such a circumstance, we are loathe to find an incremental increase in already abundant impeachment

26

evidence material. *See **Kopycinski***, 64 F.3d at 226 (strong corroboration of witness's testimony made his testimony essentially unimpeachable).

That is particularly true when, as here, the testifying witness's credibility and motivation for testifying were thoroughly explored at trial. This is not a case in which the government represented Lucero to be an upstanding citizen free of any flaw or improper motive. To the contrary, the government disclosed, at the outset of its direct examination, that Lucero was presently incarcerated on federal charges, that Lucero had two prior state felony convictions, that Lucero had an extensive history of drug abuse, that Lucero had been incarcerated for a drug charge in 1992, and that Lucero had made extensive use of aliases to evade law enforcement. The government also established that Lucero had received a more lenient sentence in exchange for his cooperation with the government on McCarty's case. Indeed, the government elicited testimony that Lucero believed his sentence had been reduced by as much as five or six years as a result of his agreement to provide information and testimony about McCarty's crimes.

McCarty's cross-examination of Lucero on these points was not in any way restricted, either by the government's objections or by the trial court's rulings. On cross-examination, McCarty's counsel restated Lucero's criminal history and elicited at least one other prior conviction for assault. McCarty's counsel also elicited

Lucero's agreement that he could have been sentenced to twenty, or even thirty, years if the government had not agreed to make a deal in exchange for Lucero's testimony against McCarty.

After Lucero testified, the jury heard from the district court that the dismissal of count 2 would not have had any effect on Lucero's sentence, and argument from the government that Lucero's reward for testifying amounted to only a one year reduction in sentence. The jury also heard McCarty's counsel argue that Lucero's subjective belief, that he could receive twenty or thirty years, was more probative of his motivation for lying than the guideline computation. *See **United States v. Landerman***, 109 F.3d 1053, 1063 (5th Cir.) ("What tells, of course, is not the actual existence of a deal, but the witness' belief or disbelief that a deal exists." (internal quotation omitted)), *modified on reh'g on other grounds*, 116 F.3d 119 (5th Cir.), *cert. denied*, 118 S. Ct. 638 (1997). All of these comments were fair comments on the evidence before the district court.

McCarty argues that there is nonetheless error because the parties now agree that, under the applicable 1990 guidelines, the district court's instruction that the dismissal of count 2 would not have had any effect was factually in error. Indeed, the parties appear to agree that Lucero faced a pre-departure guideline range of 24 to 30 months on count 1 alone, and that Lucero would have faced a pre-departure guideline range of 57 to 71 months if he had pleaded guilty to both counts 1 and 2. The district court was apparently led into factual error on this point by reliance upon

28

the 1992 guidelines rather than the 1990 guidelines.

But the district court's instruction that the dismissal of count 2 would not have had any effect is of no use to McCarty. McCarty's counsel consented, on the record, to the district court's reliance on the 1992 guidelines. Moreover, McCarty's counsel invited the district court to apply those guidelines superficially to Lucero's indictment. When the district court expressed reservation about engaging in such speculation without the assistance of a probation officer, McCarty's counsel insisted that the application be made. That was a reasonable trial strategy at the time, and McCarty cannot now be heard to complain that among the various ranges argued to the jury for the purpose of quantifying Lucero's reward, the one given by the district court at counsel's urging was factually incorrect.

Given that Lucero's testimony was essentially unimpeachable in light of the overwhelming body of evidence independently corroborating Lucero's testimony, presentation of evidence that Lucero actually had two more convictions, in addition to the three disclosed convictions and the disclosed incarceration on a drug charge, would have been cumulative and of little effect with respect to Lucero's credibility. Similarly, further elaboration on the technical application of the sentencing guidelines to Lucero's potential exposure on a charge to which he never pleaded guilty would have been cumulative in this case as to the substantial documentary and testimonial evidence, both on direct and cross-examination, that Lucero received a significant reward in exchange

for his testimony against McCarty. We are also persuaded that the district court's strong cautionary instructions with respect to testimony given in exchange for a reduction in sentence or by a witness that had prior felony convictions mitigates against the finding of error here.

Both Lucero's criminal history and the effect of his deal with the government were adequately explored at trial. There is no reasonable possibility, let alone a reasonable probability, that further exploration, even if it resulted in the disclosure of the evidence identified by McCarty, would have affected the outcome of McCarty's trial. The jury heard that Lucero benefitted between one and thirty years. Further argument about the precise range on appeal does not place the case in a different light, so as to undermine confidence in the jury's verdict. The district court's denial of relief as to McCarty's Fifth Amendment *Brady* and *Napue* claims is therefore affirmed.

## XI.

McCarty also alleges that the district court and the government violated his Sixth Amendment right to effectively cross-examine Lucero by misrepresenting to the jury the benefits Lucero received as a result of his testimony against McCarty. McCarty's claim is based upon: (1) the statement by the district court to the jury that Lucero's sentencing guideline range would have been the same without regard to whether count 2 was dismissed, and (2) the

30

government's closing argument that Lucero's reward for cooperating with the government was limited to a one year reduction in his sentencing guideline range.

The Sixth Amendment guarantees the right of an accused "to be confronted with the witnesses against him." U.S. Const. amend. VI. The primary interest secured by the Confrontation Clause of the Sixth Amendment is the defendant's right to cross-examine his accusers. *Davis v. Alaska*, 94 S. Ct. 1105, 1110 (1974). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id*. "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id*. When examining a claim under *Davis* that cross-examination was unconstitutionally impaired, we must determine whether the cross-examination was adequate to develop the issue of bias properly for the jury. *Id*. at 1111. "[T]he Confrontation clause guarantees the defendant "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Pace*, 10 F.3d 1106 (5th Cir. 1993) (internal quotations omitted). "Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Id*. Once the rigors of the Sixth Amendment are satisfied, any limitation on the scope of cross-examination is a matter for the sound discretion of the district court. *United States v. Restivo*, 8 F.3d 274, 278 (5th

31

Cir. 1993).

## XII.

There are several factors which make it doubtful that the district court's statement that count 2 had no effect on Lucero's guideline range can furnish the predicate for McCarty's Sixth Amendment claim that the district court impaired his right to cross-examine Lucero. The record supports the proposition that count 2 was not part of Lucero's reward for testifying. Even if the dismissal of count 2 did form part of Lucero's reward, the district court's statement was not made until McCarty concluded his unhampered cross-examination of Lucero. Finally, it was McCarty's counsel who invited the error by requesting that the district court apply the 1992 guidelines before the court to Lucero's indictment. When the district court expressed doubt about the need for or accuracy of any such application, McCarty's counsel insisted that the district court proceed. When the district court offered the supposition that Lucero's two offenses would merge for sentencing purposes, neither counsel objected. To the contrary, McCarty's counsel conceded that he had overlooked the fact that the two charges involved the same conduct and the same weapon. The district court essentially secured the mutual consent of counsel before taking judicial notice. Thus, the district court's action was taken pursuant to the parties' mutual consent, if not the parties' stipulation on the record, that the district court's application of the guidelines was correct.

We are likewise in doubt as to whether statements made in the

32

government's closing argument can furnish a basis for relief with respect to McCarty's Sixth Amendment claim. It is abundantly clear from the record that neither the government, nor defense counsel, nor the district court were able to accurately determine Lucero's potential exposure. The exact calculation of Lucero's sentence depended upon factors that were not taken into account when Lucero was sentenced. Proof of how those factors might have played out was a proper subject for argument at McCarty's trial. The government's closing argument, which also occurred long after McCarty concluded his unhampered cross-examination, constituted fair argument on the evidence presented. We note that McCarty's counsel quite effectively made the competing argument that Lucero's own understanding that he could face twenty to thirty years absent the government's deal was most probative of his motivation for testifying.

We are convinced that McCarty enjoyed a full and satisfactory opportunity to cross-examine Lucero about the effect of his deal with the government and any benefit that Lucero would receive as a result of his testimony. This is not a case in which the jury was not told that the testifying witness would benefit from his testimony. The only question is whether contradictory information before the jury about the extent of the benefit to be derived denied McCarty his constitutional right to cross-examine Lucero. We conclude that it did not. Whatever vagaries existed at McCarty's trial with regard to the application of the sentencing guidelines to Lucero's two counts were good faith arguments

advanced by the district court, the government and defense counsel. Those arguments were all presented to the jury for decision.

We note further that *Davis* error is subject to harmless error analysis in this Circuit. *See*, *e.g.*, **Landerman**, 109 F.3d at 1064. Assuming dubitante that McCarty has stated a claim, we would in any event find the error to be harmless in these circumstances. Our *Davis* harmless error analysis includes consideration of the following factors: (1) the importance of the witness's testimony; (2) the presence or absence of corroborating or contradicting testimony on material points; (3) the extent of cross-examination otherwise permitted; and (4) the overall strength of the prosecution's case. *Id*. at 1064 (quoting **Delaware v. Van Arsdall**, 106 S. Ct. 1431 (1986)). As should be obvious from the preceding discussion, each of these factors cut against a decision granting McCarty relief. The district court's decision denying McCarty relief as to his Sixth Amendment Confrontation clause claim is affirmed.

For the foregoing reasons, the district court's denial of McCarty's § 2255 motion for relief from his conviction and sentence is in all respects AFFIRMED.