[Cite as *State v. Widmer*, 2013-Ohio-62.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2012-02-008 |
| - vs - | : | O P I N I O N<br>1/14/2013 |
| | : | |
| RYAN K. WIDMER, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 08CR25254

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Michele L. Berry, The Citadel, 114 East Eighth Street, Cincinnati, Ohio 45202, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Ryan K. Widmer, appeals a decision of the Warren County Court of Common Pleas, denying his petition for postconviction relief and respective motions for a new trial, genetic DNA testing, and an evidentiary hearing. For the reasons discussed below, we affirm the decision of the trial court.

# I. INTRODUCTION

## A. Procedural History

{¶ 2}   On February 15, 2011, following his third jury trial, Widmer was found guilty of murdering his wife, Sarah Widmer, by forcibly drowning her in a bathtub in their home. Widmer was sentenced to 15 years to life in prison.  Widmer timely appealed his conviction to this court on March 30, 2011.  On October 12, 2011, while his direct appeal was pending, Widmer filed a petition for postconviction relief in the trial court.  The trial court denied the petition in a decision dated January 17, 2012.  Thereafter, this court affirmed Widmer's conviction on direct appeal on September 24, 2012.  *State v. Widmer*, 12th Dist. No. CA2011-03-027, 2012-Ohio-4342 ("*Widmer I*").

{¶ 3}   Widmer timely appeals the denial of his petition for postconviction relief.  In his first and second assignments of error, Widmer argues that the trial court erred in finding that the state did not violate the principles established in *Brady v. Maryland*.  Widmer claims that the state improperly withheld evidence of fraud and misconduct committed by a lead investigator in the case, former Detective Lieutenant Jeffrey A. Braley.  In his third, fourth, and fifth assignments of error, Widmer challenges the trial court's denial of his ineffective assistance of counsel claims, his request for DNA testing, and his request for an evidentiary hearing and a new trial.

{¶ 4}   We begin by discussing Widmer's arguments pertaining to Lieutenant Jeffrey Braley.  A brief overview of Braley's involvement in the case is helpful to our analysis.

## B. Braley's Involvement in the Widmer Investigation

{¶ 5}   On August 11, 2008, Lieutenant Jeff Braley, an officer with the Hamilton Township Police Department, arrived at the Widmer home as the ambulance transporting Sarah Widmer to the hospital departed from the scene.  Upon arriving, Braley was briefed by the officers who had initially responded, and was given a tour of the home by Officer Quillan

Short. After the walk-through, Braley collected and processed evidence in the home alongside Officer Short.

{¶ 6} During the first trial, Braley testified on behalf of the prosecution regarding his participation in the investigation and the collection of evidence. However, following Widmer's conviction in June 2009, a new trial was granted after it was discovered that jury members improperly discussed matters regarding the length of time it took to dry after bathing.

{¶ 7} While preparing for the second trial, the defense obtained copies of a Hamilton Township employment application form dated June 25, 1996, and a resume letter, each bearing the signature "Jeffrey A. Braley." Believing that the documents contained some inconsistencies in Braley's credentials, the defense subpoenaed Braley's personnel files from his prior employers to confirm that the information in the application and resume letter was accurate. At that time, the defense subpoenaed records from General Electric, the United States Postal Service, and Hamilton Township. Both Braley and the state moved to quash the subpoenas.

{¶ 8} On May 5, 2010, the trial court held a hearing on the motions to quash, at which time the defense confronted Braley on the employment application.[1]

{¶ 9} During the hearing, Braley testified that the June 25, 1996 date on the application was incorrect, because he did not learn of the "existence of Hamilton Township" until 1997, when he took an unpaid, volunteer position as chaplain for the township's fire department. Braley stated that he did not fill out an application for the position. Braley further testified that although the signature on the application looked similar to his own signature, he did not recall signing the form, and did not recall "at all" filling out the

---

1. Widmer did not confront Braley with the resume letter during the hearing, and did not seek to do so in subsequent pretrial motions. However, because Widmer incorporates the resume letter into his first and second assignments of error, we will refer to the resume letter to the extent necessary to address his arguments.

application.

{¶ 10} At that point, Braley examined the application and pointed out the mistakes in his credentials. First, Braley indicated that the "Education" section of the form incorrectly stated that he had a master's degree and that he had attended a college in Florida. Braley also explained that the application was incorrect as to his time spent working for the U.S. Postal Service. Rather than working as a postal inspector for two years, Braley clarified that he had only worked as a clerk for six to eight weeks. Braley also testified that he never worked as an engineer for General Electric, but rather "ran C & C Machinery for an engineering group."

{¶ 11} Following the hearing, the trial court granted Braley's and the state's motions to quash. The court reasoned that the authenticity of the employment application remained questionable, and that further inquiry into the matter would be misleading to the jury and would result in undue prejudice. *See* Crim.R. 17(C); Evid.R. 403(A) and 608(B). As a result, Widmer was denied all use of the application during the second trial.

{¶ 12} Following a mistrial, a third trial was scheduled for January 2011. Prior to that time, Widmer obtained a copy of a forensic analysis report performed on the employment application by the Ohio Bureau of Criminal Identification and Investigation (BCI report). The BCI report compared the application with known samples of Braley's handwriting and found,

> Comparison of the questioned writing in item # 1 with the samples in item # 2 revealed that the writer of item # 2 filled in the application and signed the letter in item # 1.

> Instrumental analysis of the documents in item # 1 did not reveal evidence of an alteration or the presence of more than one ink pen to fill in the application. A lack of evidence does not prove that only one ink pen was used or that no alterations could have occurred, only that there is no evidence of an alteration.

{¶ 13} As a result of this information, Widmer filed a "Motion to Allow Confrontation of Lead Investigator," seeking to confront Braley with the false statements in the application at

- 4 -

the third trial. Widmer argued that he had the right to impeach Braley's credibility with the false application, as well as the right to present an alternate defense strategy focused on Braley's dishonesty during the investigation.

{¶ 14} On January 21, 2011, the trial court denied Widmer's motion. The court found that the authenticity of the application remained in dispute, because the BCI report could not rule out the possibility of an alteration. The court also found that Evid.R. 608(B) would forbid the use of extrinsic evidence during trial to impeach Braley on a "collateral matter," and that cross-examination on the application would simply evolve into an impermissible "trial within a trial * * *." The court concluded that Braley had testified at two prior trials and that Braley's activities during the investigation were well known to the defense and were open to verification.

{¶ 15} Following his conviction and direct appeal, Widmer moved for postconviction relief, arguing that since *Widmer I*, he had discovered additional evidence withheld by the state, which proved that Braley had, in fact, authored the employment application, and therefore committed perjury during the May 5, 2010 hearing when he denied completing the form. Widmer also claimed that he had since unearthed additional evidence of misconduct relevant to the case against him. The purportedly new evidence was contained in a report prepared by the law firm of Donnellon, Donnellon & Miller (DD&M report). Widmer also submitted a "supplementary" affidavit prepared by Dennis Waller, an expert in police practices, which outlined the impact of Braley's alleged misconduct on the police investigation.

## C. The New Evidence

### 1. The DD&M Report

{¶ 16} On February 16, 2011, the day after Widmer's conviction, the Hamilton Township Trustees hired Douglas Miller with DD&M to investigate Braley's personnel files,

including the 1996 employment application and the resume letter. Miller was also told to expand his investigation to Braley's entire employment history to find any additional evidence of misconduct. On June 1, 2011, Miller issued a report outlining his findings.

{¶ 17} Miller first compared the 1996 employment application bearing Braley's name to other applications in the township's files that also appeared to have been processed in the mid-1990s. After reviewing the applications and questioning various members of the township, Miller could find no evidence that the application, along with the resume letter, were "anything other than what they appear[ed] to be," and concluded that there was no evidence that the documents were created "at the time of the Widmer trials." Miller also spoke to former Police Chief Eugene Duvelius and former Fire Chief Goebel Williams about the application. Both men told Miller that no one at the township had relied on any information in the application in hiring Braley in the department.

{¶ 18} Miller next interviewed various members of the township's police department about Braley's conduct prior to becoming a police officer. In speaking with several officers, Miller learned that Braley had, in the past, stated that he was a member of the Special Forces unit in the military. Additionally, according to former Chief Duvelius, Braley's Special Forces experience earned him a lead position in the township's tactical police raid unit, "THOR," in 2002 or 2003. However, Miller discovered that Braley did not have any Special Forces experience, and that Braley actually began serving in THOR as a civilian, but was commissioned as a police officer prior to the disbanding of the unit. Miller concluded that while it was potentially risky to have a civilian in charge of THOR, Braley did not subject the township to any liability while serving in that capacity. When Miller ultimately spoke to Braley about the Special Forces allegations, he denied ever telling such a story to his fellow officers.

{¶ 19} Pursuant to the township's request, Miller then summarized the impact of Braley's prior misconduct on his police career, stating,

Both the incidents of the Application and Resume Letter along with the actions in acquiring the status of leader of the THOR team occurred somewhat in the past. It appears to be evident that any of those documents and actions have not had any particular impact on the Township. It does not appear that anyone at the Township ever relied on either the Application or Resume Letter in any hiring or promotional decisions regarding Lt. Braley. Neither did his status as leader of the THOR team subject the Township to any actual liability * * *. However, his denial of all these matters at the current time raises an issue for the Trustees' consideration of his honesty. * * * Again, a faulty memory on his part might be excusable given that the incidents occurred so long ago. However, Lt. Braley flatly states that he never made any statement that he was in the Special Forces. For these reasons, it appears to me that there is evidence for the Township to move forward with a pre-disciplinary hearing with regard to the Application and Resume Letter, the statements regarding his involvement in Special Forces while in the military, and his denial of those matters in the course of the investigation.

**D. Waller Affidavit**

{¶ 20} After receiving a copy of the DD&M report, Widmer hired Dennis Waller, an expert in police policy, procedure, and practice to render an opinion as to Braley's impact on the murder investigation and the prosecution of Widmer. In his report, Waller classified Braley as an "opportunist without substance in a police department without established standards, [who] * * * would not have obtained this particular position [as lieutenant] without the false statements that he made about his background."

{¶ 21} Waller then opined that Braley lied about his credentials to obtain a position where he could "exert undue influence and be perceived as having credibility far exceeding his actual expertise, education, and ability." Waller also found that Braley placed undue influence on the Warren County Coroner, Dr. Russell Uptegrove, to make a finding that the cause of Sarah's death was a homicide. Toward the end of his affidavit, Waller added that "[a]n opportunist, such as Lt. Braley, could have, deliberately or inadvertently, created markings which could have inappropriately been given consideration in assessing a scene for evidence."

- 7 -

{¶ 22} Waller concluded,

> In order to make a proper decision in this case as to guilt, jurors would need to know about Braley's false statements, his lack of experience, and his lack of qualifications to properly understand how these factors likely tainted the entire investigation and prosecution in a "garbage in, garbage out" sequence. A person in law enforcement who made blatantly false and opportunistic statements in a manner consistent with what Braley did here, once it was known, would have serious credibility problems among personnel in law enforcement, the criminal justice system, and the Coroner's office.

{¶ 23} Assignment of Error No. 1:

{¶ 24} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT CONCLUDED: (1) THAT THE STATE HAD NO KNOWLEDGE OF MATERIAL INFORMATION THAT IT WITHHELD FROM THE DEFENSE; AND (2) THAT THE WITHHELD EVIDENCE PERTAINED TO A COLLATERAL MATTER ABOUT WHICH BRALEY NEVER TESTIFIED FALSELY, THUS EVEN IF DISCLOSED, IT WOULD NOT HAVE AFFECTED THE OUTCOME OF WIDMER'S TRIAL.

{¶ 25} Assignment of Error No. 2:

{¶ 26} THE TRIAL COURT ABUSED ITS DISCRETION AND RULED CONTRARY TO CLEARLY ESTABLISHED U.S. SUPREME COURT PRECEDENT BY: (1) CONCLUDING THAT WIDMER'S POST-CONVICTION PETITION FAILED TO POINT OUT MATERIAL INFORMATION KNOWN TO THE STATE THAT WAS WITHHELD FROM THE DEFENSE PRIOR TO OR DURING TRIAL; AND (2) IGNORING WIDMER'S DUE PROCESS AND CONFRONTATION CLAIMS WHEREIN HE CONTENDS THAT, DUE TO THE STATE'S FAILURE TO DISCLOSE THE INFORMATION ABOUT BRALEY CONTAINED IN THE DD&M REPORT, HE WAS DENIED THE ABILITY TO RAISE A *KYLES V. WHITLEY* DEFENSE AT TRIAL CHALLENGING THE INTEGRITY OF THE STATE'S INVESTIGATION AND CONFRONTING BRALEY ABOUT THE INFORMATION CONTAINED IN THE DD&M

REPORT.

**{¶ 27}** For ease of analysis, we will combine Widmer's first and second assignments of error. Widmer argues that the trial court erroneously denied his petition for postconviction relief, where the state knowingly presented Braley's false testimony about the employment application in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173 (1959), and withheld exculpatory evidence and impeachment material contained in the DD&M report in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

## II. *NAPUE* AND *BRADY* ANALYSIS

### A. Standard of Review

**{¶ 28}** In reviewing an appeal of postconviction relief proceedings, this court applies an abuse of discretion standard. *State v. Wagers*, 12th Dist. No. CA2011-08-007, 2012-Ohio-2258, ¶ 15. A reviewing court should not overrule the trial court's findings on a petition for postconviction relief that is supported by competent and credible evidence. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 58. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Id.* at ¶ 60.

### B. General Principles

**{¶ 29}** The crux of Widmer's arguments begins with *Brady v. Maryland*, in which the Supreme Court of the United States held that due process requires the prosecution to provide the defense with any evidence favorable to the accused that is material either to guilt or punishment. *Brady,* 373 U.S. at 87-88. The Supreme Court subsequently held that the government's *Brady* obligation includes evidence affecting a government witness's credibility. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763 (1972).

**{¶ 30}** The Supreme Court repeatedly has emphasized that,

> [t]he *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial * * *.

*United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375 (1985).

{¶ 31} Since establishing the *Brady* rule, the Court has adhered to its subsequent statement that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one * * *." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837 (1977). In fact, the Court has explained that the basis for the *Brady* rule, "the Due Process Clause * * * has little to say regarding the amount of discovery which the parties must be afforded * * *." *Wardius v. Oregon*, 412 U.S. 470, 474, 93 S.Ct. 2208 (1973).

{¶ 32} Thus, the *Brady* doctrine, in its purest form, is the rule of law that the Due Process Clause is violated when the government achieves a conviction through the use of perjured testimony, *e.g.*, *Napue*, or by withholding a confession of guilt by someone other than the accused, *e.g.*, *Brady*, or by withholding evidence "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce," *e.g.*, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392 (1976). "The doctrine evolved out of the tenet of constitutional law that it is fundamentally unfair for the government to obtain a conviction in such circumstances, regardless of whether the government suppressed the evidence knowingly or unknowingly." *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir.1988). However, "unless the omission deprived the defendant of a fair trial, there [is] no constitutional violation requiring that the verdict be set aside * * *." *Id.*, quoting *Agurs*, 427 U.S. at 108.

{¶ 33} Accordingly, the obligation *Brady* imposes on the government is "the obligation to turn over evidence in its possession that is *both* favorable to the accused and material to

guilt or punishment." *Presser*, 844 F.2d at 1281 (emphasis sic.), quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989 (1987). In a footnote to *Agurs*, the Supreme Court dismissed an argument that the definition of material evidence under the *Brady* rule should "focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." *Agurs*, 427 U.S. at 112, fn. 20. The Court stated,

> [s]uch a standard would be unacceptable for determining the materiality of what has been generally recognized as "*Brady* material" for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge.

*Id.*

{¶ 34} In the present appeal, Widmer claims that the state violated both *Brady* and *Napue* at his trial. Although the two claims are related, each claim is different and has its own materiality standard.

{¶ 35} Where there has been a suppression of favorable evidence in violation of *Brady*, the undisclosed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

{¶ 36} A different and more defense-friendly materiality standard applies under *Napue*. In cases where the prosecutor knowingly uses perjured testimony, or fails to correct what he subsequently learns was perjury, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury."

*Agurs*, 427 U.S. at 103 (emphasis added.); *Napue*, 360 U.S. at 271.

{¶ 37} We will proceed with each of these claims in turn.

## C. *Napue v. Illinois*

{¶ 38} To establish a *Napue* claim, a defendant must show that: (1) the statement was actually false, (2) the statement was material, and (3) the prosecution knew it was false. *See, e.g.*, *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998). "The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id. See also State v. Iacona*, 93 Ohio St.3d 83, 97 (2001). As discussed, a false statement is material under this standard, "'if the false testimony could * * * in any reasonable likelihood have affected the judgment of the jury * * *.'" *Giglio*, 405 U.S. at 154, quoting *Napue*, 360 U.S. at 271. *See also Keenan v. Bagley*, 1:01 CV 2139, 2012 WL 1424751 (N.D.Ohio Apr. 24, 2012). Typically, false testimony or evidence introduced by a law enforcement officer is imputed to the state.[2] *See Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"). *See also Boyd v. French*, 147 F.3d 319, 329-330 (4th Cir.1998) ("knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution").

## 1. False Testimony

---

2. Widmer argues that the trial court erred in refusing to impute knowledge of Braley's false testimony to the prosecution. It does not appear that the trial court specifically did or did not do so. Instead, the trial court focused on the fact that Widmer failed to provide any evidence of false testimony, which is a separate requirement under *Napue*. However, even if we were to agree with Widmer and impute knowledge to the state, we would still be required to find that he satisfied the remaining two *Napue* prongs before he would be entitled to relief. *See also Brady* analysis, *infra*.

{¶ 39} Here, Widmer claims that the evidence discovered since the May 5, 2010 hearing, namely, the BCI report and the DD&M report, demonstrates that Braley authored the 1996 employment application, and therefore committed perjury during the hearing when he "expressly and unambiguously disavowed" the application. We disagree.

{¶ 40} Even if we assume, for the sake of argument, that these documents conclusively establish that Braley authored the application, Widmer has not shown that Braley's testimony about the application qualifies as "actually false."[3] *See Coe*, 161 F.3d at 343; R.C. 2921.11(A). It is true that during the early stages of the May 5, 2010 hearing, Braley wavered between whether he actually completed the application and whether he simply could not "recall" doing so. However, Braley subsequently indicated that he could not recall "at all" filling out the application. Braley reiterated this point on cross-examination:

> [DEFENSE]: And I find it here, you're asked about E-1 and we'll go with E-1, which is the three page application. You were asked did you fill out this application?
>
> [BRALEY]: Yes sir, that's correct.
>
> [DEFENSE]: And your answer was you don't recall filling it out?
>
> [BRALEY]: I don't recall ever filling out an application, but I know I did not fill this out.
>
> [DEFENSE]: So your testimony is not that you can't remember filling it out but you never filled it out?
>
> [BRALEY]: No.

---

3. In reality, it is questionable that the BCI report and the DD&M report actually show that Braley authored the employment application. As we noted in *Widmer I*, the BCI report did not resolve the issues pertaining to the application's authenticity, and could not rule out the possibility of an alteration. The DD&M report also sheds very little light on these matters. First, Miller's finding that the application was not "anything other than what [it] appear[ed] to be" is vague and does not conclusively identify Braley as the author of the application. The same can be said for Miller's finding that there was no evidence that the application was created "at the time of the Widmer trials." This does not rule out other time periods between 1996 and 2009. Further, the fact that Braley may have denied filling out the application to Miller in 2011 does not show that Braley committed perjury during the May 5, 2010 hearing. Braley was not under oath when he spoke to Miller. Also, Miller's conclusion that Braley "testified under oath that he did not fill out the Application" is not a foregone conclusion, but simply another interpretation of the testimony at the May 5, 2010 hearing.

[DEFENSE]: And if you flip to Page 2, same question. You said you don't recall filling that out?

[BRALEY]: That is correct.

[DEFENSE]: And with respect to Page 3, same question. You don't recall filling that out?

[BRALEY]: That's correct.

{¶ 41} At most, Braley's testimony demonstrates some inconsistencies in the record. However, "mere inconsistencies in testimony do not establish the knowing use of false testimony by the prosecutor." *Monroe v. Smith*, 197 F.Supp.2d 753, 762 (E.D.Mich.2001), citing *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989). *See also Coe*, 161 F.3d at 343. Here, the passage of 14 years between Braley's alleged completion of the application and his testimony surely depleted Braley's memory on the issue to some extent. *See, e.g., Newsome v. Ryan*, S.D.Cal. No. 05CV1534IEG(RBB), 2007 WL 433282, * 26 (Jan. 24, 2007). Moreover, the fact "that a witness contradicts [himself] or changes [his] story also does not establish perjury." *Monroe* at 762. Upon review, we cannot say that the contradictions in Braley's testimony during the May 5, 2010 hearing amounted to perjury.[4]

## 2. Materiality

{¶ 42} Even if Braley's testimony can be construed as perjury, Widmer fails to demonstrate that the perjury was "material." As we noted, the standard for materiality under *Napue* is whether the false testimony could, in any reasonable likelihood, have affected the judgment of the jury. *Napue*, 360 U.S. at 271. Widmer claims that Braley's perjury was material as it related to his trial strategy and the impeachment of Braley.[5]

---

4. Widmer also claims that the trial court erred in deciding that "only false testimony before a jury can constitute material perjury under *Napue*." The trial court did no such thing. Instead, after addressing the truth or falsity of Braley's testimony during the May 5, 2010 hearing, the court made an additional finding that there was no evidence of perjury during trial.

5. Widmer also claims that Braley's perjury materially impacted the course of litigation, because it caused the trial court to: (1) quash his subpoenas for Braley's employment records, and (2) deny his motion to confront

### a. *Kyles* Defense Strategy

{¶ 43} Widmer first claims that Braley's perjury denied him of his right to present an alternate defense strategy, which he calls his "*Kyles v. Whitley* defense."

{¶ 44} In *Kyles*, the United States Supreme Court reversed a murder conviction upon discovering that the state had withheld evidence in violation of *Brady*. *Kyles*, 514 U.S. at 422. The evidence withheld by the state included, among other things, inconsistent eyewitness statements and inconsistent statements made by an "associate" of the defendant who allegedly had knowledge of the crime and access to the location where items taken from the victim were found. The Court held that the disclosure of the withheld evidence undermined confidence in the outcome of the trial and therefore made a different result reasonably probable. *Id.* at 441. In reaching this determination, the Court found that the withheld evidence would have "raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation." *Id.* at 445. Furthermore, the Court stated that the evidence withheld denied the defense the ability to "undermine the ostensible integrity of the [police] investigation" and "[lay] the foundation for a vigorous argument that the police had been guilty of negligence." *Id.* at 447-448.

{¶ 45} Here, Widmer asserts that if Braley had admitted to falsifying the employment application during the May 5, 2010 hearing, the defense could have discovered the information in the DD&M report in time to prepare a *Kyles* defense, focusing on the impact of Braley's incompetence and dishonesty on the integrity of the investigation, specifically: (1) the

---

Braley with the application at the third trial. First, this argument is highly speculative and focuses on the trial court's judgment, rather than the jury's. Further, as we will discuss later, the information allegedly withheld as a result of Braley's alleged perjury is collateral to, and is not probative of, the issues at trial. As this was already the primary basis for the trial court's decisions, there is no reasonable likelihood that the additional information could have changed the court's mind, or that the information would have added merit to Widmer's arguments before this court in *Widmer I*. *See Widmer I*, 2012-Ohio-4342 at ¶ 136.

processing and collecting of evidence, including the bathtub, (2) the decisions on what evidence not to collect, (3) the decision to charge Widmer, in which Braley allegedly participated, and (4) the coroner's conclusion, given Braley's attendance and alleged participation in the autopsy.

{¶ 46} Initially, we reiterate that the Supreme Court has rejected a standard of materiality that focuses on the accused's ability to prepare for trial. *See Agurs*, 427 U.S. at 112, fn. 20. *See also State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, ¶ 49 ("[a]s a rule, undisclosed evidence is not material simply because it may have helped the defendant to prepare for trial"); *Joseph v. Coyle*, 469 F.3d 441, 473, fn. 23 (6th Cir.2006). The vast majority of Widmer's brief discusses how the perjury was material to his *Kyles* strategy and trial preparation, rather than his guilt or innocence. These arguments are not within the protected scope of *Napue* and *Brady*. However, in an abundance of caution, we will review Widmer's *Kyles* claim to the extent that it is properly viewed as a materiality argument, rather than an argument that another trial strategy might have fared better with the jury. *See United States v. Parks*, 30 Fed.Appx. 534 (6th Cir.2002). *See also United States v. Angel*, 355 F.3d 462, 475 (6th Cir.2004) (rejecting petitioner's claim that the alleged perjured testimony "could have affected the jury's verdict," where the testimony was presented to the grand jury but not offered at trial); *United States v. Harmon*, N.D.Cal. No. CR 08-00938 JW, 2011 WL 7937876 (Aug. 18, 2011) (declining to apply *Napue* to allegedly perjured testimony offered before a grand jury).

{¶ 47} To analyze materiality under *Napue*, we must identify the body of evidence that Widmer argues was suppressed or made the subject of Braley's false testimony. *See Agurs*, 427 U.S. at 112; *United States v. McCarty*, 177 F.3d 978 (5th Cir.1999). Widmer claims that the *Napue* error arises out of Braley's false testimony during the May 5, 2010 hearing that he did not fill out the 1996 employment application. Widmer claims that the new evidence in the

BCI report and the DD&M report collectively demonstrates that Braley did, in fact, fill out the application. Widmer argues that the state capitalized on Braley's false testimony to conceal additional evidence of Braley's misconduct also revealed by the DD&M report, which Widmer could have used to substantiate his *Kyles* defense.

{¶ 48} For ease of analysis, we will address the various portions Widmer's *Kyles* claim separately.

### (1) Braley's Qualifications as a Lieutenant Detective

{¶ 49} While Braley's police qualifications are not an independent subsection of Widmer's *Kyles* argument, we find it prudent to address the issue separately, where Widmer continually asserts that knowledge by the jury that Braley lacked his stated credentials could have affected the jury's view of the "integrity" of the investigation and therefore the verdict. *Kyles*, 514 U.S. at 447-448; *Napue*, 360 U.S. at 271.

{¶ 50} On numerous occasions throughout the appeal, Widmer argues that the information in the DD&M report shows that Braley lied during his career to obtain positions for which he was "grossly unqualified," including his position as lieutenant detective in the Hamilton Township Police Department. Widmer thus contends that with an inexperienced officer at the helm of the police department, the entire investigation into Sarah's death was ruined, or was at least negligently conducted.

{¶ 51} In support of his claim, Widmer relies primarily on the Waller affidavit, which states that "[t]he positions held by Braley and his credibility, were in significant part due to how he presented his background and experience," and "[i]t would be highly unusual if not unheard of for someone with [Braley's] actual level of experience to be in a position of that nature."

{¶ 52} Upon review, we find that Waller's affidavit simply recasts the information discovered by DD&M in a different light to allow Widmer to insert a disingenuous, last minute

attack on Braley's police qualifications into this appeal. Waller's interpretation of the information is especially implausible, given his inability to identify which of Braley's specific activities were so egregious as to evince incompetence, as well as his failure to explain what an adequately trained police officer in Braley's position would have done.

{¶ 53} Further, contrary to Waller's opinion, the DD&M report specifically found that none of Braley's superiors hired him based on the falsehoods in the employment application or the resume letter. Thus, it is clear that Braley's alleged misconduct, including falsifying the 1996 employment application, had no bearing on the issues of whether he was qualified to be a lieutenant detective and whether he was capable of properly handling the Widmer investigation.

{¶ 54} Accordingly, insofar as Widmer claims that the newly discovered evidence on Braley's lack of certain credentials was material to discrediting the integrity of the investigation under a *Kyles* defense, this argument can be laid to rest. *See State v. Hollon*, 12th Dist. No. CA90-03-029, 1991 WL 7938, * 2 (Jan. 28, 1991).

**(2) The Collection and Processing of the Evidence**

{¶ 55} In his first true *Kyles* argument, Widmer claims that the state knowingly suborned Braley's perjury to conceal the impact of Braley's fraudulence on the collection and processing of the evidence. This argument lacks merit.

{¶ 56} Upon review, there is simply no reasonable likelihood that the jury's view of the evidence was improperly skewed as a result of not knowing that Braley may have lied about some of his qualifications in the past. As discussed, any false credentials attributed to Braley had absolutely nothing to do with his position in the police department, let alone his involvement in the Widmer investigation or his access to the evidence. The impact of Braley's alleged perjury is even less significant in light of the abundance of testimony from other officers about the evidence. Further, even without the information in the DD&M report,

the defense had ample opportunity to cross-examine Braley and other testifying officers about the orders that Braley gave at the scene, as well as his handling of the evidence. Similarly, nothing prevented Widmer from asking Braley additional questions about his actual training and experience in collecting evidence, dusting for fingerprints, and managing a crime scene investigation.

### (a) Processing the Evidence in the Bathtub

{¶ 57} As a sub-argument, Widmer claims that without the information in the DD&M report, the defense was unable to show that Braley should not have been trusted with the preservation of the bathtub during the investigation. Based on the findings in the DD&M report, Widmer now believes that Braley either: (1) inadvertently altered evidence in the tub, due to his lack of qualifications, or (2) purposefully contaminated the tub while it was in police custody, due to his tendency to "fabricate facts to advance his career * * *." We also reject this argument.

{¶ 58} As an initial matter, the jurors had already heard testimony from multiple witnesses that the evidence from the tub had changed while it was in police custody, and had apparently rejected the idea of police contamination.

{¶ 59} First, Danny Harness, a latent fingerprint examiner from the Miami Valley Regional Crime Lab, testified that when he processed the tub shortly after Sarah's death in August 2008, he used fingerprint testing methods that would have left a semi-permanent residue on the tub. Harness also stated that he could not find any fingerprints sufficient for a detailed analysis or comparison to known individuals.

{¶ 60} The state's second fingerprint witness, William Hillard, testified that three months after Sarah's death, he was called to examine the tub at the Hamilton Township police station. When Hillard arrived at the police station, he explained that Braley took him to the evidence room to see the tub. After his initial examination, Hillard stated that he could

not find any evidence that the tub had been processed several months earlier. Additionally, unlike Harness, Hillard found a fairly detailed set of fingerprints on the tub. Finally, Hillard testified that when he examined the tub at the police station for a second time, he observed additional dusting powder on the corners of the tub that he had not seen before.[6]

{¶ 61} From this testimony, Widmer could have asked Hillard whether, in his 20 years of experience, such changes in the condition of the tub were suspicious or out of the ordinary, but chose not to. Further, the jury could have easily speculated that police officers with access to the tub, including Braley, were responsible for the changes in its condition while it was in police custody. While it is not dispositive, we also note that the defense's unawareness of Braley's alleged falsehoods did not prevent it from raising chain-of-custody issues with the witnesses. During trial, the defense asked both Harness and Hillard if they knew whether the tub was in proper police custody throughout the course of the investigation, and gave pointed questions highlighting the possibility of contamination for the jury.

{¶ 62} Upon review, we find that the state's alleged withholding of the information in the DD&M report did not impact the jury's impression of the reliability of the evidence against Widmer, including the bathtub. The undisclosed evidence in the DD&M report shows, at most, that Braley fabricated credentials for jobs ten to 14 years ago and that he later denied doing so. While disclosing this information may have embarrassed Braley as a high-ranking police officer, it was hardly material to the ultimate issue of whether the evidence was

---

6. In a lengthy, two page footnote, Widmer also argues that the DD&M information was critical to launching a successful attack on the admissibility of Hillard's testimony in *Widmer I*, based on a theory that Braley, a "serial liar," added fingerprints to the tub prior to Hillard's examination, and therefore manipulated Hillard's findings. *See* Evid.R. 702(C). However, we need not address this argument, because Widmer did not raise it in his postconviction petition before the trial court. *See State v. Houser*, 4th Dist. No. 03CA7, 2003-Ohio-6461, ¶ 13; *State v. Garrett*, 7th Dist. No. 06 BE 67, 2007-Ohio-7212, ¶ 8 ("in viewing the merits of an appellant's [postconviction relief] petition, the appellate court can only address those arguments presented to the trial court in the original petition; any new arguments cannot be considered for the first time on appeal"). *See also State v. Webb*, 2nd Dist. No. 06-CA-1694, 2007-Ohio-3446, ¶ 1; *State v. McNeill*, 137 Ohio App.3d 34, 44 (9th Dist.2000). In any event, Braley's alleged misconduct of falsifying the employment application and fabricating his credentials would not have been probative of the accuracy of Hillard's testimony, as this evidence remained completely unrelated to Braley's involvement in the investigation or his handling of the evidence.

sufficient to prove that Widmer murdered Sarah. Once again, the Waller affidavit does not convince us otherwise. We have already found that Waller's opinions are disingenuous and are devoid of evidentiary value. Thus, it is not significant that Waller concluded that "[a]n opportunist, such as Lt. Braley, could have, deliberately or inadvertently, created markings which could have inappropriately been given consideration in assessing a scene for evidence." This is nothing more than conjecture, and it invades the province of the jury by essentially commenting on the credibility of Hillard's expert testimony as to the value of the fingerprints that he discovered on the bathtub. *See State v. Selvage,* 12th Dist. No. CA2011-08-058, 2012-Ohio-2149, ¶ 11 ("[a]cting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility").[7]

---

7. {¶a} One of the most significant problems Widmer has had on this appeal was his lack of ability to connect the relationship between Braley's alleged misrepresentations and the reliability, weight, or quality of the evidence collected. During oral argument, we specifically asked Widmer's counsel whether there was actually "any evidence in the record indicating either directly or by inference that Mr. Braley * * * manufactured any evidence, [or] altered any evidence[.]" Widmer's counsel made the following representations to the court:

> There is, your honor, I would point to the bathtub as the prime example of that. If you look at Volume 2 of the transcript at pages 152 and 153, you have Bill Hillard testifying. He testifies that the condition that he found the tub in, which was three months after the fact that it was ripped out of the house, it was not in the same condition as Danny Harness, the Miami Valley Crime Lab rep, left it. Remember Danny Harness, the Miami Valley Crime Lab rep, processed the tub twice, once in the Widmer home and once after Braley [seized] it from the home in his laboratory. He did the superglue fuming method, he added a bunch of the black fingerprint powder to it. The superglue fuming method, remember, locks in that powder, there were photos that Danny Harness took. There were photos that Bill Hillard took. And Bill Hillard testified that the way that Danny Harness left this tub was not the way that he found it when he reviewed it and started processing it in the basement of the Hamilton Township Police Department, where Braley had it in his possession and control for three months. Now, look what happened as a result of the bathtub being used as evidence. Bill Hillard says, "oh, I see a forearm mark in there, I see a male forearm mark." Danny Harness didn't see anything like this.

{¶b} This court is troubled by these representations made by Widmer's counsel. After reviewing the record, the only evidence of change that occurred to the bathtub according to Bill Hilliard was the presence of additional black powder. There was absolutely nothing in the record that remotely suggested that the bathtub was tampered with while in the custody of the police department. Widmer's counsel seemed to embellish the record in order to excite the passions of the media and public on this issue. Accordingly, we feel compelled to note that this almost crosses the line from permissible appellate advocacy to impermissible hyperbole that so distorts the evidence that it borders upon the absurd. However, we will give Widmer's counsel the benefit of the doubt but would caution Widmer's counsel in future when making such representations of the facts as an officer of the court.

{¶ 63} Lastly, we emphasize that the state's alleged nondisclosure did not prevent or deter Widmer from questioning Braley and other testifying officers about the handling and processing of the evidence from start to finish.

{¶ 64} Thus, we find that Braley's allegedly perjured testimony was not material to discrediting the evidence against Widmer.

### (3) What Evidence Not to Collect

{¶ 65} Next, Widmer argues that the state knowingly used Braley's perjury to conceal the fact that Braley was an "incompetent, serial liar," who likely hand-picked the evidence to support his biased belief that a homicide had occurred. This argument is also meritless.

{¶ 66} During trial, Braley admitted that he believed from very early on that Sarah did not die of natural causes. Now, according to Widmer, Braley must have only collected evidence that supported his "tunnel vision for homicide," and that it "remains unknown what other items were not collected due to their seemingly benign value in 'proving' a homicide."

{¶ 67} First, this argument is entirely too speculative to warrant much deliberation, and once again, we reject any notion that the undisclosed evidence against Braley reflects poorly upon the collection of the evidence. Further, Braley was not the only officer who collected evidence at the crime scene. The jury heard testimony from numerous officers, whose credibility was not even remotely suspect, and it is unreasonable to believe that the nondisclosure of Braley's past was the reason that the jury accepted those officers' responses. Moreover, Widmer had the opportunity at trial to question these other officers regarding their respective decision-making process in determining which evidence to collect at the scene of the crime.

{¶ 68} Thus, we find that this argument is insufficient to establish materiality under *Napue.*

### (4) The Decision to Charge Widmer

{¶ 69} Widmer next argues that the state used Braley's perjury to prevent the defense from exploring whether Braley's lack of real police experience impacted his communication with the prosecution. Based on what he knows now, Widmer believes that Braley made a "rush to judgment that a homicide had occurred" and shared this opinion with the prosecutor, who in turn relied on that information in deciding to charge Widmer with murder. We reject this argument, as well. As we have repeatedly stated, the undisclosed evidence in the DD&M report had nothing to do with Braley's involvement in the investigation, let alone his interaction with the prosecutor's office regarding this case.

### (5) The Coroner's Conclusion that a Homicide Occurred

{¶ 70} Here, Widmer argues that without the information in the DD&M report, the defense was unable to launch a full-scale attack on the medical determinations made by the Warren County Coroner, Dr. Russell Uptegrove. Widmer now believes that Braley capitalized on his perceived credibility as a lieutenant to sway Uptegrove's determination that Sarah's death was the result of a homicide.

{¶ 71} Once again, Widmer cites the Waller affidavit, wherein Waller opined "to a reasonable degree of professional certainty in the field of police practice" that,

> Dr. Uptegrove was unduly influenced by, and relied upon, representations made by Lt. Jeff Braley, who is not credible as a law enforcement officer, in making the determination in this case that the manner of death was by homicide. A medical determination that the manner of death was by homicide could very well unduly influence the decision of the prosecutors to initiate criminal charges and unduly influence jurors at a subsequent trial. Braley was simply not qualified to make determinations regarding this case and pass such opinions to Uptegrove. A coroner's opinion regarding cause of death is as reliable as the information provided to the coroner. If the information given to him is unreliable, then the opinion is unreliable in a "garbage in, garbage out" process.
>
> * * *
>
> In order to make a proper decision in this case, jurors would

need to know about Braley's false statements, his lack of experience, and his lack of qualifications to properly understand how these factors likely tainted the entire investigation and prosecution in a "garbage in, garbage out" sequence.

{¶ 72} As with Waller's other opinions, these statements lack any value in determining the issue of materiality under *Napue*. Instead, we agree with the trial court that Waller simply: (1) regurgitated Widmer's trial arguments regarding Uptegrove, (2) invaded the province of the jurors as to what they would "need to know" to make a determination of guilt, and (3) exceeded the scope of his expertise in police practices by comparing Uptegrove's medical opinions to "garbage." *See* Evid.R. 702(B); *State v. Davis*, 64 Ohio App.3d 334, 345 (12th Dist.1989).

{¶ 73} At trial, both sides questioned Uptegrove about the steps he took during Sarah's autopsy, and asked Uptegrove what specific information he used in making his medical determinations. During cross-examination, Uptegrove testified that prior to performing Sarah's autopsy, he did not review Sarah's hospital records, medical history, toxicology report, or the paramedic's sheet. Uptegrove also testified that Braley was present for part of the autopsy, and agreed with the defense that he would consider statements from police officers and EMS personnel in rendering his decision. Uptegrove also admitted that during the autopsy, he told Braley that he was "leaning towards the possibility that this could be a homicide * * *."

{¶ 74} The Waller affidavit cites this information as the basis for concluding that Braley "unduly influenced" Uptegrove's decision, because Braley's statements were essentially the only information, other than the autopsy, that Uptegrove had at the time he made this finding. However, Waller's conclusion is simply an extension of Widmer's argument that "Dr. Uptegrove admitted that he considered what Braley told him in ultimately concluding that a homicide had occurred." Moreover, both Widmer and Waller fail to acknowledge Uptegrove's

testimony that he would *never* rule a homicide simply because a police officer told him to do so, and that in determining the manner of death, he would also consider "[t]he scene investigation, the statements or historical information from individuals involved with the case, [and] the individual's medical history * * *."

{¶ 75} Further, while Braley did supply Uptegrove with information during the autopsy, other witnesses' testimony makes it very clear that Braley played a negligible role in the process. First, Doyle Burke, the chief investigator for the coroner's office, who was also present during the autopsy, testified that he did not see Braley participate in the autopsy "in any fashion." Uptegrove also testified that neither Braley nor Burke helped him "in any way."

{¶ 76} Given this evidence, we reject Widmer's claim that the jury's view of Uptegrove's testimony was improperly skewed as a result of not knowing the information in the DD&M report. Even in the event that such information was disclosed during trial, the remaining testimony demonstrates that Uptegrove made his decisions on his own accord, without Braley's influence. *See Woods v. Booker*, 450 Fed.Appx. 480, 486 (6th Cir.2011).

**(6) *Kyles* Conclusion**

{¶ 77} In sum, we find that Widmer has failed to demonstrate that Braley's perjury was material because of how it prejudiced his ability to prepare a *Kyles* defense. There is no reasonable likelihood that knowledge by the jury that Braley lied about various credentials and whether he filled out the 1996 employment application could have affected its decision on the ultimate issue of whether Widmer was guilty of murdering Sarah. This conclusion is particularly compelling in light of the ample additional evidence supporting Widmer's guilt, as we thoroughly discussed in *Widmer I*. *See United States v. Robinson*, 627 F.3d 941, 953 (4th Cir.2010) ("[e]vidence regarding a few officers' unrelated misconduct could do little to damage the extensive physical and testimonial foundation of the case").

{¶ 78} Thus, this portion of Widmer's first assignment of error is overruled. We now

address the remaining portion of Widmer's *Napue* argument, which pertains to impeachment, rather than exculpatory evidence.

### b. Impeachment Evidence

{¶ 79} Widmer also argues that Braley's perjury was material as it pertained to impeaching Braley on cross-examination.

{¶ 80} We recognize that even if a witness's false testimony does not directly affect the issue of guilt, but rather only the credibility of the witness, its use might still constitute a denial of due process under *Napue*. *See Napue*, 360 U.S. at 269-270. However, we reject Widmer's claim, where there is no reasonable likelihood that the alleged impeachment evidence could have affected the judgment of the jury.

{¶ 81} Evid.R. 608(B) permits cross-examination of specific instances of conduct that are probative of a witness's character for truthfulness or untruthfulness. The cross-examiner must take the witness's answers as given and cannot contradict a denial either by confronting the witness with extrinsic evidence or proving the matter with such evidence. *See United States v. Abel*, 469 U.S. 45, 55, 105 S.Ct. 465 (1984). However, "[a] witness may not be impeached by evidence that merely contradicts his testimony on a matter that is collateral and not material to any issue in the trial." *Byomin v. Alvis*, 169 Ohio St. 395, 396 (1959). "Evid.R. 608(B) * * * protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged." *State v. Boggs*, 63 Ohio St.3d 418, 422-423 (1992). *See also Widmer I*, 2012-Ohio-4342 at ¶ 134 ("because the potential for abuse is high, through unfair prejudice, confusion of the issues, and misleading of the jury, safeguards are erected in the form of requiring that the instances inquired into must be *clearly* probative of truthfulness or untruthfulness") (Emphasis sic.); *State v. Rainey*, 2nd Dist. No. 23070, 2009-Ohio-5873, ¶ 20.

{¶ 82} Here, we find that cross-examining Braley on the employment application and

the other information in the DD&M report would have only created a dispute about purely collateral matters, *i.e.*, whether Braley fabricated various credentials over ten years ago for jobs unrelated to his position as lieutenant detective. Braley was not on trial for fraud or misconduct; Widmer was on trial for murder, and examining this part of Braley's past would only lead to surprise, jury confusion, and a waste of time, which are the very reasons for the rule against impeachment on collateral matters. *See* Evid.R. 608; *State v. Myers*, 9th Dist. C.A. No. 25737, 2012-Ohio-1820. *See also* Evid.R. 403.

{¶ 83} Even if the information did not pertain to a collateral matter, there is no reasonable likelihood that impeaching Braley with the new evidence could have affected the jury's decision. In this regard, our facts are readily distinguishable from *Napue*. *See State v. Mills*, 12th Dist. No. CA99-11-198, 2001 WL 237096, * 9 (Mar. 12, 2001); *United States v. Stewart*, 323 F.Supp.2d 606, 620 (N.Y.S.2004).

{¶ 84} In *Napue*, the prosecution's principal witness denied that he had received a promise of leniency in exchange for his testimony. Knowing this testimony to be false, the prosecutor did nothing to correct it. The Supreme Court characterized the witness's testimony, which comprised the bulk of the prosecution's evidence against the defendant, as "extremely important." *Napue*, 360 U.S. at 266. Thus, it reversed the defendant's conviction, reasoning that it would violate due process not to do so, where the prosecution's knowing use of false testimony bearing directly on the credibility of a key witness "may have had an effect on the outcome of the trial." *Id.* at 272.

{¶ 85} Here, Braley's trial testimony cannot be described as extremely important, central, or material to the prosecution's case against Widmer. As the trial court noted, other witnesses corroborated the important portions of Braley's testimony. Thus, the subject matter of Braley's testimony was hardly of the sort where his credibility "may well [have been] determinative of [Widmer's] guilt or innocence * * *." *Id.* at 269. Under these circumstances,

we find that any impeachment value of the new information in the DD&M report was undermined by the other evidence in the record, thus it cannot be considered material impeachment evidence in the *Napue* sense. *See Hutchison v. Bell*, 303 F.3d 720, 745 (6th Cir.2002).

### 3. Imputed Knowledge of Perjured Testimony

{¶ 86} The third and final prong of *Napue* requires a defendant to show that the state knew that the witness's testimony was false. As we mentioned briefly above, a police officer's knowledge about a case, including the truth or falsity of his testimony, is typically imputed to the state, but because Widmer has failed to satisfy at least one other *Napue* prong, we need not address this issue in depth. *See Kyles*, 514 U.S. at 437. However, as we discuss in detail under *Brady* below, we have serious doubts as to whether Braley's knowledge of the information in the DD&M report is imputable to the state.[8]

### 4. *Napue* Conclusion

{¶ 87} Pursuant to the standards set forth in *Napue*, we find that there is no reasonable likelihood that the state's alleged use of Braley's pretrial perjury could have affected the jury's verdict. The subject matter of Braley's allegedly false testimony was neither exculpatory nor significantly impeaching, and outside of Braley's trial testimony, the jury still heard ample evidence of Widmer's guilt. *See Widmer I.* Accordingly, the trial court did not abuse its discretion in denying Widmer's request for postconviction relief on these grounds, and the court did not violate Widmer's due process and confrontation rights under *Napue* or *Kyles*.

{¶ 88} Widmer's first assignment of error is overruled.

---

8. According to Widmer, other individuals with knowledge attributable to the prosecution were aware of Braley's misconduct, thanks to an independent investigation of Braley by the Hamilton Township Board of Trustees in July 2010. Again, we need not decide whether this is actually the case, given Widmer's failure to establish materiality.

**D. *Brady v. Maryland***

{¶ 89} In his second assignment of error, Widmer claims that regardless of whether Braley committed perjury, the prosecution violated *Brady v. Maryland* by failing to disclose the evidence in the DD&M report, along with any other favorable evidence, prior to the third trial.

{¶ 90} In *Brady*, the Supreme Court held that a criminal defendant's due process rights are violated if the prosecution suppresses evidence that is material to the defendant's guilt or punishment. *Brady*, 373 U.S. at 87. *See also Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936 (1999). The law in *Brady* applies regardless of whether the defendant has expressly requested such evidence and encompasses both exculpatory and impeachment evidence. *Strickler* at 280.

{¶ 91} In order to establish a *Brady* violation, Widmer must show that: (1) the evidence at issue was favorable to him, either because it was exculpatory or because it was impeaching, (2) the evidence was suppressed by the state, either willfully or inadvertently, and (3) prejudice ensued. *Id.* at 281-282.

**1. Widmer's Requested Standard of Review**

{¶ 92} As an initial matter, Widmer asserts that the trial court wholly failed to address his *Brady* claims, and therefore asks us to review these arguments *de novo*. We decline to do so. Here, the trial court addressed all of the issues in Widmer's petition in an extremely thorough and well-reasoned opinion, and detailed the Supreme Court cases cited by Widmer, including *Brady*, as well as their application to this case. The court found that Widmer "failed to point to any information that was known by the State that was not turned over to him," and additionally found "no lack of confidence in the verdict." These are precisely the principles espoused by *Brady*. *See Strickler*, 527 U.S. at 289-290, quoting *Kyles*, 514 U.S. at 434

(under *Brady*, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"). Thus, we reject this argument and proceed with an abuse of discretion review. *See Wagers*, 2012-Ohio-2258 at ¶ 15.

### 2. Favorable Evidence

**{¶ 93}** In terms of the first requirement of *Brady*, we have already found that the information on Braley is not exculpatory as to Widmer, and that it has very little impeachment value. However, for the sake of argument, we will treat the evidence as favorable to Widmer.

### 3. Suppression and Imputed Knowledge

**{¶ 94}** As to the suppression prong, we note that the state did not actually receive the DD&M report until after the third trial. *See Agurs*, 427 U.S. at 103; *Hicks v. Collins*, 384 F.3d 204 (6th Cir.2004) (no *Brady* violation where there was no evidence that the prosecution knew of the favorable exculpatory material prior to trial). However, Widmer argues that Braley's knowledge of the contents of the DD&M report was imputed to the state, because Braley was a "state agent" involved in the investigation. *See Strickler*, 527 U.S. at 289-281, quoting *Kyles*, 514 U.S. at 438 (the *Brady* rule encompasses evidence "known only to police investigators and not to the prosecutor").

**{¶ 95}** Initially, we agree with Widmer that *Brady's* requirements "do not stop at the prosecutor's door," and that the knowledge of those who are part of the investigative team is imputed to the prosecutor, regardless of the prosecutor's actual awareness. *Robinson*, 627 F.3d at 951, citing *Kyles*, 514 U.S. at 437. We also agree that police are treated as an arm of the prosecution for *Brady* purposes, and that their knowledge of the case should be imputed to the state. *Kyles* at 437 ("the individual prosecutor has a duty to learn of any

favorable evidence known to the others acting on the government's behalf in the case, including the police"). *But see Walker v. Lockhart*, 763 F.2d 942, 958 (8th Cir.1985) ("not all police knowledge should be imputed to the prosecution").

{¶ 96} Here, Widmer claims that because Braley had actual knowledge of his own misconduct as contained in the DD&M report, and because he was working on the state's behalf, the prosecution violated its constitutional duties to learn of the evidence and disclose it. However, we would be remiss to accept this argument without at least slight hesitation. It is one thing to require prosecutors to inquire into whether the police have discovered exculpatory or impeachment evidence during the course of their investigation. It is quite another to require them, "on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case." *Robinson*, 627 F.3d at 952. Here, Braley's alleged misconduct is so remote in time, and is so unrelated to his role in the investigation and to the state's case against Widmer, that it is difficult to burden the prosecution with an obligation to discover this evidence.

{¶ 97} Yet, even if we assume, for the sake of this opinion only, that the doctrine of imputed knowledge extends this far, Widmer still fails to satisfy the materiality requirement of *Brady*.[9]

### 4. Prejudice/Materiality

---

9. {¶a} Widmer also asserts that the state had knowledge of, and concealed, the results of a separate, internal investigation of Braley conducted by the Hamilton Township Trustees in July 2010. Widmer believes that the trustees' report contains information "identical" to the contents of the DD&M report, only that this time, the information was received from Braley under oath. However, because it is clear to us that *Brady* was not violated because of the lack of materiality, we need not address Widmer's contention that the state "suppressed" the trustees' report. *See United States v. Pelullo*, 399 F.3d 197, 217 (3rd Cir.2005).

{¶b} As his final sub-argument, Widmer contends that the government purposefully delayed ordering the DD&M report until after Widmer's conviction in order to avoid learning information that may have undermined the prosecution's case. Again, we need not decide this issue, because Widmer still cannot establish materiality. That is, as discussed below, there is no reasonable probability that, had the evidence in the DD&M report come to light earlier, the result of Widmer's trial would have been different.

**{¶ 98}** "Prejudice (or materiality) in the *Brady* context is a difficult test to meet * * *." *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir.2011). Evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682. *See also Strickler*, 527 U.S. at 281. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. *Brady* materiality is not a strictly quantitative inquiry; "[r]ather, it is more of a qualitative inquiry in which a reviewing court must ask whether the suppressed evidence casts sufficient doubt on a petitioner's conviction that it puts the case 'in a different light.'" *Smith v. Metrish*, 436 Fed.Appx. 554, 563 (6th Cir.2011), quoting *Kyles* at 435. As we discussed earlier, the *Brady* materiality assessment is more stringent than the inquiry under *Napue.*

**{¶ 99}** Widmer's materiality arguments under *Brady* are similar to the ones that he raised under *Napue*, namely, that the nondisclosure of the facts contained in the DD&M report precluded him from preparing a *Kyles* defense, deprived him of critical impeachment evidence, and materially impacted the course of litigation.[10]

**{¶ 100}** As to Widmer's *Kyles* claim, our focus under *Brady*, much like *Napue*, is not on the impact of the suppressed information on trial strategy, but whether the evidence was material either to guilt or punishment. *See Strickler*, 527 U.S. at 280; *Agurs*, 427 U.S. at 104, fn. 10. *See also United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994) ("[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for

---

10. For the same reasons as stated in footnote five, we reject Widmer's argument that disclosing the withheld information would have likely altered the course of litigation by prompting the trial court to grant his subpoena requests or sustain his Motion to Confront Lead Investigator.

trial"). However, for the sake of completeness, we will address whether the alleged suppression denied Widmer a fair trial by precluding a challenge to the "integrity" of the investigation. *Kyles*, 514 U.S. at 447-448; *Agurs* at 108. *See also* Crim.R. 16(B).

{¶ 101} After a thorough review of the record below, we find that even if the allegedly suppressed evidence in the DD&M report could have helped the defense to cast some doubt on the police investigation under *Kyles*, it is not enough to establish materiality. *Id.* at 109-110 ("[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense"). As we discussed previously, even without this information, Widmer had the opportunity to cross-examine Braley and the numerous other witnesses about the investigation from start to finish. It is simply untenable to believe that the suppression was the reason for Widmer's scant questioning on this matter, or that disclosing Braley's alleged misconduct would have cast sufficient doubt in the jury's mind about the investigation so as to generate a reasonable probability of a different result. *Bagley*, 473 U.S. at 682.

{¶ 102} Moreover, the suppressed information was not material impeachment evidence. *See id.* at 676-677; *United States v. Jones*, 399 F.3d 640, 648 (6th Cir.2005). Generally, impeachment evidence constitutes *Brady* material when the evidence relates directly to a key witness's veracity on matters about which he or she has testified at trial. *See Giglio*, 405 U.S. at 154. However, as we discussed earlier, Braley was not a key witness, and the allegedly suppressed evidence pertained only to collateral matters that had nothing to do with Braley's trial testimony. *See, e.g., People v. Fernandez*, 249 A.D.2d 3, 5, 670 N.Y.S.2d 840 (1998) ("where the impeachment information has no bearing on defendant's guilt or innocence, such as where the prosecution witness's misconduct is completely unrelated to the trial at which he is testifying and [his] testimony is not crucial to the prosecution's case, its nondisclosure does not constitute a *Brady* violation"). Even if the new evidence was severely impeaching, the

fact remains that Braley's credibility was not determinative of Widmer's guilt or innocence. Instead, Braley's testimony was simply cumulative to the considerable evidence bearing on Widmer's guilt, and there is no reasonable probability that impeaching Braley would have resulted in a different outcome. *See* Evid.R. 608(B); *Agurs*, 427 U.S. at 112; *Jones*, 399 F.3d at 648.

### 5. *Brady* Conclusion

{¶ 103} In sum, even if we assume that the information on Braley should have been disclosed, when we review the record as a whole, we cannot conclude that our confidence in the verdict has been undermined. *See Bagley*, 473 U.S. at 682. In other words, there is not a reasonable probability that the outcome of Widmer's trial would have been different, had the evidence in the DD&M report been disclosed. *Id.* Accordingly, the trial court did not abuse its discretion in denying Widmer's request for postconviction relief under *Brady*.

### E. Ineffective Assistance of Counsel

{¶ 104} Widmer concludes his second assignment of error with a challenge to the effective assistance of trial counsel. Here, Widmer alleges that in the "unlikely" event that the state timely disclosed Braley's perjury and misconduct, trial counsel was ineffective for failing to follow up on the evidence and for failing to develop a *Kyles* defense.

{¶ 105} In determining whether counsel's performance constitutes ineffective assistance, an appellate court must find that counsel's actions fell below an objective standard of reasonableness and that the appellant was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052 (1984). In performing its review, an appellate court is not required to examine counsel's performance under the first prong of the *Strickland* test if an appellant fails to prove the second prong of prejudicial effect. *State v. Clark*, 12th Dist. No. CA2008-09-113, 2009-Ohio-2101, ¶ 18. In demonstrating prejudice, an appellant must show that there is a reasonable probability that, but for counsel's errors,

the result of the trial would have been different. *Id.*, citing *Strickland* at 694. A strong presumption exists that a licensed attorney is competent and that the challenged action is the product of sound trial strategy and falls within the wide range of professional assistance. *Id.*

{¶ 106} As we found above, Widmer has failed to demonstrate that, had the evidence in the DD&M report been disclosed, the result of trial would have been different. Thus, we find that trial counsel's hypothetical failure to pursue the evidence would not have had a prejudicial effect. Accordingly, the trial court did not abuse its discretion in rejecting Widmer's ineffective assistance of counsel argument.

{¶ 107} Widmer's second assignment of error is overruled.

{¶ 108} Assignment of Error No. 3:

{¶ 109} THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT WIDMER'S POST-CONVICTION REQUEST FOR GENETIC DNA TESTING OF SARAH WIDMER'S BIOLOGICAL REMAINS TO DETERMINE IF SHE SUFFERED FROM A GENETIC DISORDER. SUCH GENETIC TESTING IS NECESSARY TO PROPERLY REVIEW THE POST-CONVICTION CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, BECAUSE IF TESTING DEMONSTRATED THAT SARAH SUFFERED FROM A GENETIC DISORDER, THEN TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS FOR FAILING TO PURSUE WHAT WOULD HAVE LED TO CRUCIAL, EXCULPATORY EVIDENCE FOR THE JURY'S REVIEW. BUT BECAUSE THE TRIAL COURT DENIED WIDMER'S REQUEST FOR TESTING, IT UNREASONABLY FORECLOSED ANY POSSIBILITY OF EVALUATING WHETHER TRIAL COUNSEL PROVIDED CONSTITUTIONALLY DEFICIENT ASSISTANCE IN THIS REGARD.

{¶ 110} In his third assignment of error, Widmer argues that the trial court erroneously denied his application for DNA testing of Sarah's biological remains.

### III. DNA TESTING

### A. Standard of Review

{¶ 111}  We review the trial court's decision regarding the acceptance or denial of an offender's application for postconviction DNA testing for an abuse of discretion.  *See, e.g., State v. Broadnax*, 2nd Dist. No. 24121, 2011-Ohio-2182, ¶ 14.  An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable.  *Gondor*, 2006-Ohio-6679 at ¶ 60.

### B. Background

{¶ 112}  In April 2011, Widmer filed a "Motion to Preserve Evidence," seeking to preserve Sarah Widmer's biological remains and all physical evidence collected from the crime scene pursuant to R.C. 2933.82.  One month later, the trial court granted Widmer's motion.  Subsequently, in his postconviction petition, Widmer requested that the court grant access to Sarah's biological remains for the purpose of DNA testing.  Widmer argued that testing would determine whether Sarah suffered from a congenital heart defect called Long QT Syndrome, which may have caused her to drown.[11]  Widmer also sought DNA testing to prove ineffective assistance of trial counsel, based on counsel's failure to seek DNA testing at the trial level.  The trial court denied Widmer's request upon finding that his arguments were unfounded in the evidence.

{¶ 113}  On appeal, Widmer argues that the trial court abused its discretion by denying his request for DNA testing.  Widmer also challenges the constitutionality of Ohio's DNA testing scheme, arguing that it violates the Due Process Clauses and the Equal Protection Clauses of the Ohio and United States Constitutions.

---

11. According to an affidavit prepared by Widmer's medical expert, Dr. Michael Gregory Balko, Long QT Syndrome is a "rare condition," in which patients are "at an increased risk for sudden cardiac death relative to the general population."  According to Balko, a "curious association exists between drowning and the Long QT Syndrome."

## C. Ohio's DNA Testing Scheme

{¶ 114}   Since 2003, Ohio law has provided specific procedures for postconviction DNA testing.   *See* Am.Sub.S.B. No. 11; Am.Sub.S.B. No. 262; Am.Sub.S.B. No. 77.   Currently, under R.C. 2953.71 through .81, eligible offenders may petition the trial court to order state funded DNA testing on biological material from their cases.   R.C. 2953.72(C)(1) establishes criteria for preliminary eligibility, and R.C. 2953.74 outlines additional factors that must be satisfied before a trial court "may accept" an application for DNA testing.   *See* R.C. 2953.74(B), (C).

{¶ 115}   Under the current DNA testing scheme, offenders may apply to have their own DNA compared against biological evidence recovered from the victim or the crime scene, for the purpose of scientifically precluding the offender as a "contributor of biological material from the crime scene or victim in question * * *."   R.C. 2953.71(G).   *See also* 2953.74(C).   In essence, the DNA testing statutes provide an opportunity for the accused to establish that another individual committed the crime in question.

{¶ 116}   Widmer concedes that he does not qualify under the statutes, because he has requested a test of Sarah's DNA, rather than his own, and he seeks to diagnose a genetic defect, rather than to exclude himself as a contributor of DNA at the crime scene. Nevertheless, he argues that he should not be precluded from postconviction DNA testing, where he has offered to pay for all DNA tests himself.   For this reason and various policy-based reasons, Widmer argues that the trial court abused its discretion by denying his request for DNA testing.

### 1. R.C. 2933.82

{¶ 117}   Widmer first argues that disallowing DNA testing in his case runs contrary to R.C. 2933.82, which was the basis for the trial court's decision to grant his Motion to Preserve Evidence.   Under R.C. 2933.82, "governmental evidence-retention entit[ies],"

including courts, must secure biological evidence in an "amount and manner sufficient to develop a DNA profile * * *." R.C. 2933.82(B)(3). In light of this statute, Widmer argues that the trial court "arbitrarily and unreasonably refused to permit [him] access to the *same evidence* for the *same purpose* as the trial court already granted the Preservation Order." (Emphasis sic.)

{¶ 118} The state responds that R.C. 2933.82 does not address whether a trial court should grant an application for DNA testing. We agree with the state. The Ohio legislature created an entirely different scheme in R.C. 2953.71 et seq. to address applications for DNA testing. Thus, we cannot say that the trial court acted unreasonably in the face of R.C. 2933.82 in denying Widmer's application for DNA testing.

### 2. Outcome Determinative Results

{¶ 119} As an alternate argument, Widmer claims that although he is ineligible for state funded DNA testing, his request for privately funded DNA testing could lead to "outcome determinative evidence" in accordance with the meaning of the term under R.C. 2953.71(L), which states,

> "Outcome Determinative" means that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in division (D) of section 2953.74 of the Revised Code, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense or, if the offender was sentenced to death relative to that offense, would have found the offender guilty of the aggravating circumstance or circumstances the offender was found guilty of committing and that is or are the basis of that sentence of death.

{¶ 120} According to Widmer, testing Sarah's DNA could show that she suffered from Long QT Syndrome, which would have highlighted the possibility that she drowned as a

result of natural causes. Widmer believes that if this evidence was admitted at trial, there is a "strong probability that no reasonable factfinder would have found [him] guilty" of murder. Thus, Widmer sees no reason that he should have been denied the opportunity to test Sarah's DNA.

{¶ 121} We recognize that Widmer has private funds for testing, and therefore he would not place a financial burden on the state by testing for the desired outcome. However, Widmer asks us to read the term "outcome determinative" in a much broader sense than clearly intended by the legislature. Widmer contends that R.C. 2953.71(L) "simply requires a helpful DNA test result that would raise reasonable doubt * * *." However, the legislature used far more specific language that limits testing to the "subject offender's" biological tissue and the biological material of unidentified prospective perpetrators. By all accounts, postconviction relief is a very narrow remedy, and a decision expanding both the scope and the core meaning of a statutory term is more properly left to the legislature. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68, 129 S.Ct. 2308 (2009); *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994); *State ex rel. Nimberger v. Bushnell*, 95 Ohio St. 203, 214 (1917).

{¶ 122} Thus, we reject Widmer's second argument.

### 3. Resolving the Issues in Widmer's Postconviction Petition

{¶ 123} Widmer next contends that "Ohio's official interpretation of SB 77 makes clear that a court can order DNA testing outside of the statutes when: (1) the inmate has timely filed a post-conviction motion; and (2) the court would need the results of the DNA testing to fairly assess the merits of the post-conviction claim." Here, Widmer claims that without DNA testing, the trial court could not properly assess the merits his ineffective assistance of counsel claim. According to Widmer, a finding that Sarah suffered from Long QT Syndrome would demonstrate ineffective assistance of trial counsel, where, but for counsel's failure to

seek DNA testing at the trial level, the jury could have considered whether Sarah died of natural causes.

{¶ 124} In support of this proposition, Widmer cites Attorney General Opinion No. 2005-009, wherein the Ohio Attorney General stated that "R.C. 2953.71-.81 and R.C. 2953.82 are not the exclusive means by which an inmate may obtain post-conviction DNA testing," and that "Sub. S.B. 11 does not prevent an inmate from obtaining DNA testing in a post-conviction judicial proceeding when such testing will assist a court in ruling on a post-conviction motion or petition." [sic] 2005 Ohio Atty.Gen.Ops. No. 2005-009, at paragraph three of the syllabus, 11.

{¶ 125} Widmer relies on the advisory opinion to support his assertion that the trial court abused its discretion by ruling that "genetic testing [was] not necessary and not an aide to properly evaluating the ineffective assistance claim * * *." We disagree.

{¶ 126} First, Widmer fails to recognize that the Attorney General was interpreting former R.C. 2953.71 to 2953.82, which were enacted pursuant to Sub.S.B. 11, not Sub.S.B. 77, which now contains the language in R.C. 2953.84 that,

> The provisions of sections 2953.71 to 2953.81 of the Revised Code by which an offender may obtain postconviction DNA testing are not the exclusive means by which an inmate may obtain postconviction DNA testing, and the provisions of those sections do not limit or affect any other means by which an offender may obtain postconviction DNA testing.

{¶ 127} Further, the Attorney General did not address whether offenders could petition the court to test a victim's DNA, or whether the court should grant such a request. Instead, the Attorney General simply stated that there could be additional situations in which an inmate may successfully petition the trial court to order DNA testing. *Id.* at 14, fn. 26 ("a court may in certain instances, *but is not required to*, order DNA testing when considering a post-conviction petition for relief"). (Emphasis added.) *See also State v. Constant*, 11th Dist. No.

2008-L-100, 2009-Ohio-3936 (finding that 2005 Ohio Atty.Gen.Ops. No. 2005-009 was rendered "moot" as a result of statutory revisions since Sub.S.B. 11).

{¶ 128} Moreover, to accept Widmer's argument would result in the broadest interpretation of the statutes by any court to date. Widmer perceives the Attorney General's opinion as a go-ahead for courts to order DNA testing on a *victim*, so long as the results of that test would help the court resolve an issue in a postconviction claim. However, as with Widmer's other suggested interpretations, he asks us to read into the statutes a remedy that the law fails to supply. For this court to extend the DNA testing statutes to include victims, or even to incorporate the language used by the Attorney General, would be, we think, tantamount to amending the statute by judicial interpretation, "thus violating the age old principle that the duty of courts is * * * to interpret the law and not to make law." *Bayer v. Am. Ship Bldg. Co.*, 79 Ohio App. 450, 455 (8th Dist.1946). "It is not our province to guess what the [l]egislature intended but rather to ascertain the intent of the language which it did adopt * * *." *Katz v. Dept. of Liquor Control of Ohio*, 166 Ohio St. 229, 232 (1957).

{¶ 129} Here, the statutes do not embrace victims as the subjects of DNA testing, and we see no indication that this was a mere oversight by the legislature. We also do not read R.C. 2953.84 to be so expansive as to include testing on victims, particularly when this would require numerous other changes to the guidelines for application and testing set forth in R.C. 2953.71 through .81. *See Bushnell*, 95 Ohio St. at 214. The operation of a statute should not "be so enlarged as to embrace subjects not specifically enumerated * * * if the legislature desires to include certain persons who are not included within the terms of a statute, it should act and the statute should not be extended by judicial construction." 85 Ohio Jurisprudence 3d, Avoidance of Interpolation and the Like, Section 132 (2012). *See also Police & Firemen's Disability & Pension Fund v. Akron*, 149 Ohio App.3d 497, 2002-Ohio-4863, ¶ 14 (9th Dist.) ("[a] statute cannot be extended by construction to persons or things not falling within its

terms, although they may appear to be within the reason and spirit of the statute").

{¶ 130} Thus, we decline to adopt Widmer's interpretation of the DNA testing scheme, and we reject his idea that this case falls "squarely" within the scenario outlined by the Attorney General's opinion. *See In re Estate of Roberts*, 94 Ohio St.3d 311, 317 (2002) ("[t]here is no authority under any rule of statutory construction to add to, enlarge, supply, expand, extend or improve the provisions of the statute to meet a situation not provided for"). The DNA testing statutes, or any suggested interpretations thereof, do not support a finding of an abuse of discretion in this matter.

{¶ 131} However, even if, strictly for the sake of this opinion, we consider Widmer's argument, we would still reject his claim that the trial court erred by overruling his ineffective of counsel claim without resorting to DNA testing results.

{¶ 132} In a postconviction petition asserting ineffective assistance of counsel, the petitioner must first show that "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." *State v. Oberding*, 12th Dist. No. CA2011-09-101, 2012-Ohio-3047, ¶ 28, citing *Strickland*, 466 U.S. 668. *See also State v. Pankey*, 68 Ohio St.2d 58, 59 (1981). Regarding the first prong, a petitioner must demonstrate that his counsel's representation "fell below an objective standard of reasonableness." *Strickland* at 688. The second prong requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

{¶ 133} A trial court's decision resolving a postconviction claim of ineffective assistance

of counsel "will be upheld absent an abuse of discretion when the trial court's finding is supported by competent and credible evidence." *Gondor*, 2006-Ohio-6679 at ¶ 60.

**{¶ 134}** Here, Widmer fails to demonstrate an abuse of discretion by the trial court, where a showing that Sarah actually suffered from Long QT Syndrome was not necessary for determining whether Widmer suffered prejudice as a result of trial counsel's failure to seek DNA testing.[12]

**{¶ 135}** "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at paragraph 2(b) of the syllabus. As the trial court noted here, even without DNA testing results, the jury heard, and presumably considered, expert testimony as to the possibility that Sarah suffered from a sudden cardiac event, including Long QT Syndrome.[13] Widmer has failed to show that, but for trial counsel's failure to seek actual DNA testing, the jury's consideration of this matter would have been different. Given the amount of evidence in favor of Widmer's guilt, as well as the evidence already before the jury regarding Long QT Syndrome, Widmer has failed to demonstrate that counsel's failure to seek DNA testing deprived him of "a trial whose result is reliable." *Id.* at 687.

**{¶ 136}** In sum, we reject Widmer's argument that the trial court abused its discretion by dismissing his ineffective assistance of counsel claim without ordering DNA testing on

---

12. Widmer admits that it "may have been impossible for trial counsel to pursue [DNA testing] based on the technology available at the time." However, in order to analyze the prejudice prong of *Strickland*, we will assume, without finding, that the appropriate DNA tests were available prior to or during the third trial.

13. Specifically, Widmer elicited testimony about Long QT Syndrome from Dr. Russell Uptegrove, Dr. Michael Gregory Balko, and Dr. William Rogers. For instance, on direct examination, Widmer specifically asked Balko whether, based on Sarah's clinical history and the autopsy, there was any evidence that she suffered from Long QT Syndrome. Balko responded affirmatively, and explained that Sarah exhibited several traits commonly associated with a specific strain of Long QT called Anderson Tawil Syndrome, including a cleft palate and headaches. In the context of Long QT Syndrome and other heart conditions, Rogers testified that some manifestations of sudden cardiac death would not be detectable in an autopsy, and that patients who never exhibited symptoms of a cardiac condition could still have one, and that it could cause them to drown. Widmer drew similar testimony about autopsies from Uptegrove on cross-examination.

Sarah's biological remains.

## 4. Constitutionality

{¶ 137} Next, Widmer challenges the constitutionality of Ohio's DNA testing scheme on due process and equal protection grounds.

## a. Standard of Review

{¶ 138} We begin our discussion with the premise that all statutes are presumed constitutional. *State v. Thompkins*, 75 Ohio St.3d 558, 560 (1996). "The party challenging the statutes bears the burden of proving otherwise." *Id.* "Further, the legislation being questioned will not be invalidated unless the challenger establishes that it is unconstitutional beyond a reasonable doubt." *Id.*, citing *Arnold v. Cleveland*, 67 Ohio St.3d 35, 38-39 (1993).

## (1) Due Process

{¶ 139} Widmer first claims that the trial court's refusal to grant him access to Sarah's biological remains constitutes a violation of his substantive and procedural due process rights under the Ohio and United States Constitutions. Specifically, Widmer contends that it violates due process to prevent those who are willing to pay for DNA testing from accessing the state's evidence to test a victim's DNA for a genetic defect.

{¶ 140} As to Widmer's substantive due process claim, the Supreme Court of the United States has unambiguously concluded that there is no substantive due process right to obtain evidence for DNA testing in a postconviction setting. *See Osborne*, 557 U.S. at 68. Accordingly, Widmer fails to establish a substantive due process right to access Sarah's biological remains for DNA testing.

{¶ 141} Regarding Widmer's procedural due process claim, the Supreme Court mandates a two-step analysis: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by

the State were constitutionally sufficient."  *Swarthout v. Cooke*, __ U.S. __, __, 131 S.Ct. 859, 861 (2011).  "A liberty interest may arise from the Constitution itself * * * or it may arise from an expectation or interest created by state laws or policies * * *."  *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384 (2005).

**{¶ 142}**  First, postconviction relief is strictly a statutory right, not a constitutional right.  *See State v. McGuire*, 12th Dist. No. CA2000-10-011, 2001 WL 409424, * 8 (Apr. 23, 2001).  Thus, we ask whether Ohio law recognizes the existence of a liberty interest in the postconviction DNA testing of a victim's biological remains.  We find that it does not.  As previously discussed, the plain language of the current DNA testing statutes does not include within their scope the testing of a victim's DNA.  *See Doe v. Marlington Local Sch. Dist. Bd. of Edn.*, 122 Ohio St.3d 12, 2009-Ohio-1360, ¶ 29; *Katz*, 166 Ohio St. at 232; *Bushnell*, 95 Ohio St. at 214.  Thus, because Widmer has no statutorily recognized liberty interest in accessing the state's evidence to test Sarah's DNA, he is not entitled to procedural due process.  *See, e.g.*, *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741 (1983).

### (2) Equal Protection

**{¶ 143}**  Widmer also claims that the trial court's application of R.C. 2953.71 et seq. violates his equal protection rights.

**{¶ 144}**  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."  Ohio's Equal Protection Clause, Section 2, Article I of the Ohio Constitution, states, "All political power is inherent in the people.  Government is instituted for their equal protection and benefit * * *."  These constitutional guarantees do not forbid classifications.  "[They] simply keep[ ] governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Burnett v. Motorists Mut. Ins. Co.*, 118 Ohio St.3d 493, 2008-Ohio-2751, ¶ 30; *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326 (1992).

Thus, the comparison of only similarly situated persons or groups is integral to an equal protection analysis. *See, e.g., GTE N., Inc. v. Zaino*, 96 Ohio St.3d 9, 2002-Ohio-2984, ¶ 22.

{¶ 145} Here, Widmer's claim fails for the fundamental reason that he is not similarly situated to the offenders listed in R.C. 2953.71 et seq. so as to violate the guarantees of equal protection. There is a vast difference between offenders who seek to compare their own DNA against that of an unidentified prospective perpetrator, and those who wish to test a victim's DNA for, perhaps, an interminable array of ailments in the hopes of discovering some mitigating evidence. The concepts are so distinct as to be beyond comparison, and, quite simply, "there is no requirement of equal treatment between differently situated persons." *Home Depot U.S.A., Inc. v. Levin*, 121 Ohio St.3d 482, 2009-Ohio-1431, ¶ 19, citing *GTE* at 22 ("the Equal Protection Clause does not require things which are different in fact * * * to be treated in law as though they were the same").

{¶ 146} Accordingly, we find that Widmer's equal protection claim lacks merit.

### D. Conclusion

{¶ 147} Having considered and rejected all of Widmer's arguments regarding Ohio's postconviction DNA testing scheme, we overrule Widmer's third assignment of error.

{¶ 148} Assignment of Error No. 4:

{¶ 149} THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING WIDMER ACCESS TO THE GRAND JURY TESTIMONY OF BRALEY AND UPTEGROVE, OR AT A MINIMUM CONDUCTING AN IN CAMERA INSPECTION OF SAID TESTIMONY, WHEN WIDMER DEMONSTRATED A PARTICULARIZED NEED FOR ACCESS TO THE TESTIMONY FOR A REVIEW OF: (1) WHETHER BRALEY MADE ANY FALSE STATEMENTS TO THE GRAND JURY WHICH WOULD SUPPORT HIS *BRADY*, *KYLES*, AND *NAPUE* CLAIMS; AND (2) WHETHER THE TESTIMONY OF EITHER WITNESS REVEALS WHAT INFORMATION, OR THE EXTENT TO WHICH, BRALEY SUPPLIED

INFORMATION ABOUT THE CASE TO UPTEGROVE THAT HE CONSIDERED IN HIS

DETERMINATION THAT SARAH WIDMER DROWNED AS A RESULT OF HOMICIDE.

THIS ERROR IN VIOLATION OF WIDMER'S PROCEDURAL AND SUBSTANTIVE DUE

PROCESS RIGHTS UNDER THE U.S. CONSTITUTION AND THEIR RELATED

COUNTERPARTS IN THE OHIO CONSTITUTION, INCLUDING MEANINGFUL ACCESS

TO THE COURTS.

{¶ 150} Widmer now argues that the trial court erred when it denied his request to review the grand jury testimony of Lieutenant Jeff Braley and Dr. Russell Uptegrove.[14] Widmer argues that the trial court denied him due process of law and his right to access the courts.

## IV. GRAND JURY TESTIMONY

### A. Background

{¶ 151} Along with his postconviction petition, Widmer filed a "Motion to Compel Grand Jury Testimony of Witnesses Braley and Uptegrove," or, in the alternative, requested that the trial court perform an in camera inspection of the testimony. Widmer believed that Braley and Uptegrove likely testified to additional information before the grand jury, which was relevant to the arguments in his postconviction petition.

### B. Braley's and Uptegrove's Grand Jury Testimony

{¶ 152} The disclosure of grand jury testimony is governed by Crim.R. 6(E), which provides that,

> [a] prosecuting attorney * * * may disclose matters occurring before the grand jury, other than deliberations of a grand jury or the vote of a grand juror, but may disclose matters only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the

---

14. The trial court did not specifically overrule Widmer's motion for the disclosure of grand jury testimony. However, it is well settled that "a motion that is still pending at the time of the final disposition of a case is presumed to have been denied, and the mere failure to rule is harmless error." *State v. Piesciuk*, 12th Dist. No. CA2007-04-086, 2008-Ohio-4054, ¶ 28, citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 223 (1994).

defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

{¶ 153} In *State v. Greer*, the Supreme Court of Ohio stated that grand jury proceedings are secret, and that a defendant has no right to inspect grand jury transcripts either before or during trial unless the "ends of justice require it and there is a showing by the defense that a particularized need for the disclosure exists which outweighs the need for secrecy." *State v. Greer*, 66 Ohio St.2d 139 (1982), paragraph two of the syllabus. A particularized need is established when the circumstances reveal a probability that "the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." *Id.* at paragraph three of the syllabus.

{¶ 154} The existence of a particularized need is a fact question to be determined by the trial judge, and the ultimate decision rests within the sound discretion of the court. *See Greer* at paragraphs one and three of the syllabus; Crim.R. 6(E). A decision denying the release of the grand jury transcript will not be reversed absent an abuse of discretion. *State v. Coley*, 93 Ohio St.3d 253, 261 (2001). An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Gondor*, 2006-Ohio-6679 at ¶ 60.

{¶ 155} Widmer first claims that an inspection of Braley's grand jury testimony was necessary to determine whether Braley made any false statements to the grand jury that would support his *Brady*, *Kyles*, and *Napue* claims. Widmer also believes that either Braley or Uptegrove testified before the grand jury as to Braley's involvement in the autopsy, and that this testimony was essential to determining whether Braley improperly influenced Uptegrove's homicide determination. Widmer submits that he had a reasonable basis for his suspicions based on the "newly discovered" evidence that Braley,

> (1) has committed perjury in this case; (2) fabricated his background, including experience in the Air Force Special Services, in order to enjoy a meteoric rise in the Hamilton

- 48 -

Township Police Department (*e.g.*, appointment as director of the THOR Unit); (3) has a pattern of making false statements to advance his career; (4) was grossly unqualified to hold the position he held in this case according to the unrefuted opinion of a police practices expert attesting to national standards in the field; and (5) supplied information about the case to Uptegrove, which Uptegrove admitted he considered in issuing his decision that a homicide occurred. [sic]

{¶ 156} From this information, Widmer constructs a basis for his suspicions that falls well short of meeting his burden for the grand jury disclosure that he seeks. First, Widmer's purported particularized need for Braley's testimony is riddled with unsupported assumptions that Braley acted in conformity with his alleged past falsehoods in testifying before the grand jury. Additionally, Widmer does not explain how the nondisclosure of Braley's grand jury testimony deprived him of a "fair adjudication of the allegations placed in issue" by Braley's testimony, when we have already established that none of the above factors impacted the investigation or the evidence against Widmer, which were the topics of Braley's testimony.

{¶ 157} Further, as seen by his trial testimony, Dr. Uptegrove relied primarily on medical factors in making his homicide determination, rather than Braley's input, and Widmer fails to set forth a basis for his belief that the grand jury heard differently.

{¶ 158} In sum, Widmer has failed to set forth a particularized need for the disclosure of Braley's or Uptegrove's grand jury testimony that outweighs the need for secrecy. Thus, we find that the trial court did not abuse its discretion in denying Widmer's request for the production of the grand jury transcripts, or an in camera inspection thereof.

{¶ 159} Widmer's fourth assignment of error is overruled.

{¶ 160} Assignment of Error No. 5:

{¶ 161} THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING WIDMER'S OCTOBER 12, 2011 POST-CONVICTION PETITION WITHOUT A HEARING BECAUSE THE PETITION AND MATERIAL APPENDED TO IT DEMONSTRATE A *PRIMA FACIE*

CASE OF CONSTITUTIONAL VIOLATIONS. THIS ERROR OCCURRED IN VIOLATION OF WIDMER'S PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS UNDER U.S. CONSTITUTION AND THEIR RELATED COUNTERPARTS IN THE OHIO CONSTITUTION, INCLUDING MEANINGFUL ACCESS TO COURTS.

**{¶ 162}** In his fifth and final assignment of error, Widmer asserts that the trial court erroneously denied his petition for postconviction relief without holding an evidentiary hearing.

### V. POSTCONVICTION HEARING AND MOTION FOR NEW TRIAL

### A. Standard of Review

**{¶ 163}** In reviewing an appeal of postconviction relief proceedings, this court applies an abuse of discretion standard in determining whether the trial court erred in denying the petitioner's motion without a hearing. *State v. Clark*, 12th Dist. No. CA2008-09-113, 2009-Ohio-2101, ¶ 7. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Gondor*, 2006-Ohio-6679 at ¶ 60.

### 1. Evidentiary Hearing

**{¶ 164}** A petitioner seeking postconviction relief is not automatically entitled to an evidentiary hearing on the petition. *Clark* at ¶ 8, citing *State v. Calhoun*, 86 Ohio St.3d 279, 282 (1999). In order to obtain such a hearing, the petitioner must show that there are substantive grounds for relief that would warrant a hearing based upon the petition, supporting affidavits, and files and records in the case. *Id. See also State v. Jackson*, 64 Ohio St.2d 107, 110 (1980). Substantive grounds for relief exist where there was such a denial or infringement of the petitioner's constitutional rights so as to render the judgment void or voidable. R.C. 2953.21(A)(1); *Calhoun* at 282-283. The burden is on the petitioner to show that the claimed errors resulted in prejudice before a hearing on a postconviction relief

petition is warranted. *Calhoun* at 283.

{¶ 165} Here, Widmer claims that he set forth substantive operative facts establishing deprivations of his constitutional rights through: (1) the DD&M report; (2) an affidavit from trial counsel, Ravert J. Clark, explaining that the defense was unaware of the information in the DD&M report prior to or during the third trial; and (3) the Waller affidavit, describing Braley's alleged impact on the police investigation. We disagree with Widmer.

{¶ 166} A review of the trial court's 18-page opinion shows that the court was thorough in its analysis and did not abuse its discretion in overruling Widmer's postconviction petition without a hearing. The trial court did not find substantive facts supporting a claim for postconviction relief on constitutional grounds, holding that Widmer's claims under *Brady*, *Kyles*, *Napue*, *Strickland*, and the Due Process Clause lacked merit. For the reasons exhaustively discussed throughout this opinion, we find that the record supports the trial court's conclusions. *See State v. Watson*, 126 Ohio App.3d 316, 325 (12th Dist.1998). Thus, we overrule Widmer's argument that the trial court abused its discretion by denying his postconviction relief petition without a hearing.

### B. Motion for a New Trial

{¶ 167} While it is not raised as a separate assignment of error, Widmer also claims that he is entitled to a new trial based upon the newly discovered evidence contained in the DD&M report. *See* Crim.R. 33(A)(6).

{¶ 168} Crim.R. 33 provides the grounds for which the trial court may grant a new trial and sets forth the time limitations for filing a motion for a new trial. Motions for a new trial on the basis of newly discovered evidence must be filed within 120 days of the verdict. Crim.R. 33(B). However, the trial court may grant the defendant leave to file a belated motion if "it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial" within this time period. *Id.* Clear and convincing

evidence is evidence "which will [produce] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *State v. Workman*, 12th Dist. No. CA2000-03-049, 2000 WL 1221715, * 2 (Aug. 28, 2000), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 169} In order to prevail on a motion for a new trial based upon newly discovered evidence, the defendant must establish that the evidence,

> (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

{¶ 170} The decision to grant or deny a motion for a new trial is within the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. *State v. Scheibel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. As stated, an abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Gondor*, 2006-Ohio-6679 at ¶ 60.

{¶ 171} We find that the trial court did not abuse its discretion in denying Widmer's motion for a new trial for two reasons. First, Widmer's motion was untimely, as it came 239 days after the verdict in his third trial, and Widmer failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from filing his motion within 120 days of the verdict.

{¶ 172} Secondly, the purportedly new evidence did not warrant a new trial. As we discussed in overruling Widmer's previous assignments of error, the evidence advocated as "newly discovered" was not material to the issues at trial, and there is no strong probability that any or all of this evidence would change the outcome if a new trial were granted. Thus,

we find that the trial court did not abuse its discretion in overruling Widmer's motion for a new trial.

{¶ 173}  Widmer's fifth assignment of error is overruled.

{¶ 174}  Judgment affirmed.

YOUNG, J., concurs.

RINGLAND, J., concurs separately.

**RINGLAND, J., concurring separately.**

{¶ 175}  I concur with the judgment of the majority.  However, I write separately to address the trial court's decision to deny Widmer's motion for postconviction relief as it relates to his request for genetic testing.

{¶ 176}  While I cannot find that the trial court abused its discretion in denying the motion, I believe the better practice would be to schedule an evidentiary hearing to provide greater clarity on the issues surrounding the requested genetic testing.  From the record before us, we are unable to determine whether the requested test was available prior to the third trial, or whether a positive result from the test for genetic mutations of the specific cardiac channel subunits is dispositive of Long QT Syndrome.  When dealing with questions such as this surrounding a new or innovative area of science, an evidentiary hearing would help to complete the record and provide a better understanding of the grounds for the requested relief.

{¶ 177}  However, I recognize that, "pursuant to R.C. 2953.21(C), a trial court properly denies a defendant's petition for post-conviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish

substantive grounds for relief." *State v. Calhoun*, 86 Ohio St.3d 279, 1999-Ohio-102. Therefore, I cannot find that the trial court abused its discretion when it denied Widmer's motion for postconviction relief where Widmer failed to meet his burden in setting forth the answers to those questions posed above in his petition, affidavits, documentary evidence, files and record.

{¶ 178} For the reasons outlined above, I concur with the majority.


Young, J., retired, of the Twelfth Appellate District, sitting by assignment of the Chief Justice, pursuant to Section 6(C), Article IV of the Ohio Constitution.